## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) ) | |
| Petitioner, | ) ) | Civil Action No. 3:15 CV 0452 |
| v. | ) ) | |
| POWHATAN ENERGY FUND, LLC, HOULIAN "ALAN" CHEN, HEEP FUND, INC., and CU FUND, INC. | ) ) ) ) | JURY TRIAL REQUESTED |
| Respondents. | ) ) ) | |

## PETITION FOR AN ORDER AFFIRMING THE FEDERAL ENERGY REGULATORY COMMISSION'S MAY 29, 2015 ORDER ASSESSING CIVIL PENALTIES AGAINST POWHATAN ENERGY FUND, LLC, HEEP FUND, INC., HOULIAN "ALAN" CHEN, AND CU FUND, INC.

Petitioner Federal Energy Regulatory Commission (FERC or Commission), pursuant to section 31(d) of the Federal Power Act (FPA), 16 U.S.C. § 823b (2012), petitions this Court for an Order Affirming the Commission's May 29, 2015 Order Assessing Civil Penalties, *Houlian Chen, Powhatan Energy Fund, LLC, HEEP Fund, LLC, CU Fund, Inc.*, 151 FERC ¶ 61,179 (2015) (the Order). The Commission's Order is attached as Exhibit 1.

### SUMMARY OF THE ACTION

1.     This is an action for enforcement of a Commission order assessing civil penalties against Respondents Powhatan Energy Fund, LLC, HEEP Fund, Inc., CU Fund, Inc., and against Respondent Houlian "Alan" Chen, who executed trades on behalf of Powhatan, HEEP Fund, and CU Fund between June 1 and August 3, 2010 (Manipulation Period).

2.      In its Order, the Commission found that Respondents had manipulated the wholesale energy markets by implementing a scheme involving the execution of large volumes of offsetting trades – which the Commission found to be wash trades – for the purpose of capturing "excessive amounts of certain credit payments." Order at P 1.

3.      The Commission's Order was issued on May 29, 2015, following a multi-year investigation and an adversarial show cause proceeding.

4.      The Commission initiated its investigation in the summer of 2010, after PJM Interconnection, L.L.C. (PJM), the Regional Transmission Organization (RTO) responsible for operating the mid-Atlantic wholesale electric market, and PJM's Independent Market Monitor (IMM), responsible for overseeing the electricity marketplace in which the Respondents executed their trades, alerted the Commission to possible manipulative behavior in that market, i.e., that certain market participants – including Respondents – were reserving unusually large volumes of transmission in connection with financially-settled Up-To Congestion (UTC) trades "solely to inflate transaction volumes in order to receive an improper allocation of marginal loss surplus revenue." Order at P 27 (quoting Confidential Referral of Potential Violations of FERC Market Rule at 4 (Aug. 16, 2010) (PJM Referral)).

5.      In the multi-year investigation that followed, the Commission's Office of Enforcement (Enforcement or staff) determined that Respondents designed and implemented a fraudulent trading scheme based on self-canceling financial transactions designed to eliminate market risk while capturing otherwise un-merited payment from PJM. These payments were known as the marginal loss surplus allocation or "MLSA." Contemporaneous emails uncovered in the investigation showed that Respondents understood these trades were otherwise unprofitable – that they "'would not touch'" some of the trades other than to capture credit payments from PJM

– and that they understood their scheme to be "'to make money by moving electricity around in a circle.'" Order at PP 45, 46 (quoting Email from Alan Chen to Kevin Gates (March 5, 2010, 9:37 PM) and Email from Kevin Gates to Alan Chen (Aug. 12, 2010, 4:18 PM), respectively). Specifically, the investigation determined that the scheme involved executing large volumes of offsetting trades between the same two points at the same time in order to zero out market risk and capture volume-based credits "'risk-free (almost to the point).'" *Id.* n.218 (quoting Email from Alan Chen to Kevin Gates (March 5, 2010, 9:37 PM)).

6.      The investigation further determined that, through this scheme, Respondents extracted over $10 million in fraudulently obtained payments that would otherwise have been allocated to market participants engaged in bona fide transactions, such as Dominion Virginia Power.  Order at P 68.

7.      On December 17, 2014, the Commission issued an order directing Respondents to show cause why they should not be found to have violated section 222 of the FPA, 16 U.S.C. § 824v(a) (2012), and section 1c.2 of the Commission's Regulations, 18 C.F.R. § 1c.2 (2014) (Anti-Manipulation Rule).  (Order to Show Cause, (together with Order Revising Show Cause Order issued December 18, 2014) is attached hereto as Exhibit 2.)  A staff report ("Staff Report"), prepared by the Commission's Office of Enforcement investigative staff, which set forth the legal and factual basis for the Order to Show Cause, was attached to that order.  Exhibit 2 Appx. A.

8.      Issuance of the Order to Show Cause commenced an adversarial adjudicative proceeding, during which Respondents presented factual evidence and legal arguments directly to the Commission.

9.      On January 12, 2015, pursuant to FPA section 31(d)(3), 16 U.S.C. § 823b(d)(3) (2012),
Respondents elected to forgo an opportunity for an agency hearing before an administrative law
judge pursuant to 5 U.S.C. § 554 (2012), and instead to have the Commission promptly assess a
civil penalty in the absence of such a proceeding.  The statute provides that if a respondent fails
to pay an assessed penalty within 60 days, the Commission may seek affirmance of its penalty in
federal district court.

10.     On May 29, 2015, after examining the arguments submitted by all parties and after
reviewing the extensive factual record, the Commission issued its Order Assessing Penalties.  In
the Order, the Commission concluded that Respondents "violated section 222 of the Federal
Power Act (FPA) and section 1c.2 of the Commission's regulations, which prohibit energy
market manipulation, through a scheme to engage in fraudulent Up-To Congestion (UTC)
transactions in PJM Interconnection L.L.C.'s (PJM) energy markets to garner excessive amounts
of certain credit payments to transmission customers." Order at P 1 (footnotes omitted).  The
Commission also determined that the trades constituted a wash trading scheme in violation of the
Commission's prohibition of that practice.  Order at P 6.

11.     The Commission concluded that, "[i]n light of the seriousness of these violations, we find
that it is appropriate to assess civil penalties pursuant to section 316A of the FPA [16 U.S.C. §
825o-1(b) (2012)] in the following amounts:  $16,800,000 against Powhatan; $10,080,000
against CU Fund; $1,920,000 against HEEP; and $1,000,000 against Dr. Chen." Order at P 1.

12.     Additionally, pursuant to section 309 of the FPA, 16 U.S.C. § 825h (2012), the
Commission directed disgorgement of unjust profits plus applicable interest in the following
amounts:  $3,465,108 for Powhatan; $1,080,576 for CU Fund; and $173,100 for HEEP.  Order at
P 1.

13.     The Order sets forth detailed analyses of the factual evidence, the legal arguments

presented by both sides, and the applicable civil penalty under the FPA and the Commission's

Penalty Guidelines.

14.     The Commission found that

> [f]rom June 1 to August 3, 2010 (Manipulation Period), Respondents designed
> and implemented a fraudulent UTC trading scheme to receive excessive amounts
> of MLSA payments. To do this, Respondents intentionally placed a high-volume
> of 'round-trip' UTC trades that canceled each other out by placing the first leg of
> the trade from locations A to B, and simultaneously placing a second leg of equal
> volume from locations B to A. The contemporaneous evidence shows that
> Respondents artificially created these round-trip UTC trades solely to reserve
> transmission service to enable them to collect excessive MLSA payments during
> the Manipulation Period.

Order at P 3 (footnote omitted).

15.     The Commission concluded, "based on the totality of the evidence" that Respondents'

round-trip UTC trades

> operated as a course of business to defraud and a device, scheme, or artifice to
> defraud the PJM market and market participants . . . . The evidence demonstrates
> that Respondents placed high-volume round-trip UTC trades without regard to
> market fundamentals and with the intent to benefit not from the spread on UTC
> trades but solely from the MLSA payments, and we find those actions to
> constitute fraud. We also find that Respondents were engaged in wash trading,
> which the Commission has long recognized as fraudulent conduct. Moreover, we
> find that the Respondents had notice that the type of trading at issue here is
> fraudulent and violates FPA section 222 and our Anti-Manipulation Rule.

*Id.* P 51 (footnote omitted).

16.     Applying its non-binding Penalty Guidelines to the facts of that proceeding, the

Commission found the recommended penalties appropriate and imposed the penalties as

recommended. *Id.* PP 149 – 187.

17.     Under FPA section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) (2012), this Court "shall have

authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a

judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part" the Commission's penalty assessment. The Respondents having failed to make payment within the 60 day time period set forth in the FPA, the Commission now respectfully brings this action to enforce the terms of the Order without modification.

## JURISDICTION

18.     This Court has subject matter jurisdiction over this action pursuant to FPA section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) and 28 U.S.C. § 1331 (2012). This Court has personal jurisdiction over each of the Respondents pursuant to Fed. R. Civ. P. 4(k)(1)(C) in that FPA section 317, 16 U.S.C. § 825p (2012), provides for nationwide service of process and therefore satisfies this subdivision of Rule 4, which provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute."

## VENUE

19.     Venue is also governed by FPA section 317, 16 U.S.C. § 825p, which provides that "[a]ny suit or action to enforce any liability or duty created by . . . this Act, or any rule, regulation, or order thereunder may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is an inhabitant."

20.     Venue is established in this district as to all Respondents pursuant to the "any act or transaction constituting the violation" clause of § 825p because the Commission found that they engaged in an unlawful scheme to manipulate energy markets in the mid-Atlantic United States, including in this District, from June to August 2010. Respondents' unlawful scheme resulted in the misdirection and capture of over $10 million in PJM market payments, including approximately $1,147,087 that would otherwise have flowed to Dominion Virginia Power and

inured to the benefit of Dominion and its ratepayers, including ratepayers in this District. Order at P 68.

21.     Furthermore, as to Chen, HEEP Fund, and Powhatan, venue is also established in this district based on the "any act or transaction" clause because they entered into an Advisory Agreement (Powhatan Advisory Agreement) pursuant to which Chen, through HEEP, placed the Powhatan trades that the Commission found to violate FPA § 222 and Rule 1c.2. Order at P 47. In the Powhatan Advisory Agreement, these Respondents stipulated that, in the event of a dispute arising out of that agreement, legal recourse would be made "only in the courts of the Commonwealth of Virginia, City of Richmond, or . . . in the United States District Court for the Eastern District of Virginia," and states that Powhatan and HEEP "waive any objection to venue laid therein." Prior to the Manipulation Period, Chen traded for two of Powhatan's predecessor companies, which were controlled by the same principals, and both of which maintained their principal places of business in the Richmond, Virginia area.

22.     Powhatan is also an inhabitant of this District in that it maintains its principal place of business in Henrico, Virginia, within this District.

23.     In addition to the basis applicable to all Respondents, CU Fund, which is incorporated and maintains its principal place of business in Texas, is venued in this District through Chen, who is its sole owner and lone employee. Order at n.415. Inasmuch as venue is established in this district as to Chen, it is necessarily established as to CU. Chen implemented a single scheme, not only through HEEP and on behalf of Powhatan, but also through and on behalf of CU Fund, which was controlled by, and operated for the sole benefit of, Chen.

## PARTIES

**Petitioner**

7

24.    FERC is an administrative agency of the United States, organized and existing pursuant to the FPA, 16 U.S.C. § 791a *et seq.* (2012).

25.    FERC is an administrative agency with independent litigating authority. By statute, "[e]xcept as provided in section 518 of title 28, relating to litigation before the Supreme Court, attorneys designated by the Chairman of the Commission may appear for, and represent the Commission in, any civil action brought in connection with any function carried out by the Commission pursuant to this chapter or as otherwise authorized by law." 42 U.S.C. § 7171 (i) (2012).

**Respondents**

26.    At all relevant times, Powhatan Energy Fund, LLC was a private investment fund organized as a Delaware corporation with its primary place of business in Henrico, Virginia. The managing member of Powhatan is LSE Capital Management, LLC, a Delaware corporation with its primary place of business in Henrico, Virginia. The sole member of LSE Capital Management, LLC is Lawrence S. Eiben (Eiben), a resident of Henrico, Virginia. At all relevant times, Eiben was the sole executive officer of Powhatan.

27.    At all relevant times Houlian "Alan" Chen maintained his residence in The Woodlands, Texas. He incorporated both HEEP and CU in Texas and maintains their principal places of business there. He was the signatory to Advisory Agreements with both Powhatan and with its predecessor companies, pursuant to which he traded UTC in PJM, including the trades for Powhatan that are the basis for the civil penalties and disgorgement assessed by the Commission.

28.    At all relevant times, HEEP Fund, Inc. was a private investment fund organized as a Texas corporation with its primary place of business in Texas. The sole shareholder and employee of HEEP Fund is Houlian "Alan" Chen, a resident of The Woodlands, Texas.

29.    At all relevant times, CU Fund, Inc. was a private investment fund organized as a Texas corporation with its primary place of business in Texas. The sole owner and employee of CU Fund is Houlian "Alan" Chen, a resident of The Woodlands, Texas.

## THE COMMISSION'S ANTI-MANIPULATION AUTHORITY

30.    In the wake of manipulative schemes in the western U.S. electricity markets by Enron and others, Congress, through the Energy Policy Act of 2005, amended the FPA to give the Commission broad authority to prohibit market manipulation. In relevant part, FPA section 222, 16 U.S.C. § 824v(a), makes it "unlawful for any entity . . . directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy . . . any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers."

31.    The Commission implemented this statute in 2006 by promulgating the Anti-Manipulation Rule, which prohibits an entity from: (1) (a) using a fraudulent device, scheme, or artifice, or (b) making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule, or regulation, or (c) engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity, (2) with the requisite scienter, (3) in connection with the purchase or sale of electricity subject to the jurisdiction of the Commission. 18 C.F.R. § 1c.2 (Anti-Manipulation Rule). As the Commission noted in the Order, "Under the Anti-Manipulation Rule, fraud includes, but is not limited to, 'any action, transaction, or conspiracy for the purpose of impairing, obstructing, or defeating a well-functioning market.'" Order at P 35 (quoting

*Prohibition of Energy Market Manipulation*, Order No. 670, FERC Stats. & Regs. ¶ 31,202, at P 50 (2006)).

32.     The Energy Policy Act of 2005 also provided the Commission with increased civil penalty authority for violations of Part II of the FPA or of "any rule or order issued thereunder." FPA section 316A, 16 U.S.C. § 825o-1, authorizes the Commission to assess civil penalties against violators of up to $1 million for each day that a violation occurs. The Commission has found that each separate transaction that constitutes a violation is subject to a $1 million per day penalty. Order at P 150 (citing *Barclays PLC, et al.*, 144 FERC ¶ 61,041, at P 120 n.347 (2013); *see also Energy Transfer Partners, L.P.*, 120 FERC ¶ 61,086, at P 69 (2007)). In assessing penalties, the Commission must consider "'the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner.'" Order at P 151 (quoting FPA section 316A, 16 U.S.C. § 825o-1). The Commission's imposition of civil penalties on organizations is also guided by its advisory Penalty Guidelines. *Revised Policy Statement on Penalty Guidelines*, 132 FERC ¶ 61,216 (2010).

## BACKGROUND

### The PJM Market & The UTC Product

33.     PJM is a Regional Transmission Organization (RTO) that operates a 13-state wholesale organized electricity market stretching from Illinois to North Carolina, and including all of Virginia but a small portion of the southwestern part of the state. Order at P 15. More than 61 million people depend on electricity administered by PJM.

34.     PJM uses market-based systems to provide electricity at the lowest possible cost consistent with maintaining the reliable operation of the grid. To send appropriate price signals, "[e]lectricity prices in PJM vary based on the specific location, or node, within the market."

Order at P 15.  Since prices vary by location, market prices for energy at particular nodes are called "Locational Marginal Prices" (LMPs).  As the Commission explained in the Order,

> Three components summed together form the LMP: (i) an energy price (which is the same at each node and represents the cost to serve the next increment of load (demand) at a pre-determined reference location); (ii) the cost of congestion (which varies at each node depending on the limitations of the transmission system to move power freely between constrained and non-constrained locations); and (iii) the cost of line losses . . . .

*Id.*

35.     The Order notes that "PJM operates a dual settlement market, with both a day-ahead market and a real-time market." *Id.* P 16.  In the day-ahead market, market participants engage in transactions involving energy that will flow through power lines the following day (a "day ahead" of the proposed flow date).  In the day-ahead market, participants may make bids and offers to buy or sell energy – either physically or "virtually" – for the next day, specifying the quantity, price, location, and hour of delivery.  As the Commission has previously noted, "the vast bulk of transactions occur" in the day-ahead market.  *Black Oak Energy, LLC v. PJM Interconnection, L.L.C.*, 125 FERC ¶ 61,042, at P 41 (2008).

36.     In the real-time market, market participants engage in transactions involving energy that will flow through power lines the same day.  The real-time market is also referred to as a "Balancing Market," because one of its functions is to "balance" any deviations in supply and demand schedules created by PJM based on the day-ahead market transactions.  Each LMP settles at a unique price in both the day-ahead and real-time markets, reflecting the combination of the three price components — energy, congestion, and line losses — applicable to that particular node.  PJM provides the trading platforms and, with its IMM, oversees the trading activity.

37. The Commission has also authorized PJM and other organized markets to allow non-physical or "virtual" traders (also referred to as "arbitrageurs") to participate in wholesale electric markets because their participation will, in theory, "increase market liquidity, drive convergence between the day-ahead and real-time market, and provide vehicles for hedging." Order at P 17 (footnote omitted).[1] As the Commission noted,

> [w]hile virtual products carry no obligation to buy or sell physical power, they serve a direct role in day-ahead price formation as reflected in day-ahead LMPs. As such, virtual products [that are integrated into the organized market's pricing model] can: (1) be the price setting marginal factor in determining day-ahead LMPs; (2) affect day-ahead dispatch; and (3) affect other market participant positions.

*Id.* (footnote omitted).

38. With virtual transactions a purchase (or sale) at the day-ahead price is automatically sold (or purchased) at the real-time price. While virtual trades do not result in the physical delivery of power, they are entered into the day-ahead market settlement software and thus impact the rates paid for physical electricity.

39. This case concerns Respondents' trading of one of PJM's virtual products, called "Up-To Congestion" or "UTC." The name is derived from the fact that in entering into a UTC transaction, the trader specifies that it will pay "up to" a specified dollar amount (capped at $50) for delivery from a specified location ("node") of a specified quantity of energy to a specified location at a specified hour. If the market price calculated by PJM's pricing model is at or below the price specified by the person placing the transaction, the transaction will clear.

40. During and prior to the Manipulation Period, placing a UTC trade was a two-step process: As the first step, the trader would use PJM's Open Access Same Time Information

---

[1] The Commission explained in the Order that "Convergence in the PJM market is the reduction in the spread between day-ahead and real-time LMPs at a specific node." Order at n.26.

System (OASIS) to reserve some amount of transmission for the intended transaction. If transmission capacity was available, the trader would receive an OASIS reservation number, which enabled the trader, as the second step, to enter the transaction specifics – time of day, source and sink nodes (i.e., the pricing points),[2] volume, and the "up-to" price limit he was willing to pay – into a different PJM system. After the time period for entering transactions closed, PJM would establish the day-ahead prices at the nodes. For a trader's bid to be accepted (i.e., to "clear"), his bid had to equal or exceed the day-ahead price spread on the trader's specified path (i.e., the difference in day-ahead price between the source and sink nodes). If the bid cleared, then the profitability of the transaction would be determined by whether the price spread in the real-time market on the chosen path was higher or lower than it had been in the day-ahead market, that is, whether the trader had accurately predicted any change in congestion between the day-ahead and real-time.

41.     The Commission approved the participation of virtual traders in its regulated markets because, in principle, the knowledge and acumen required to profit from arbitrage potentially benefited the market by contributing to price convergence and market liquidity, both of which promote market efficiency.  Order at P 20.

42.     The Commission had previously found that that UTCs were "integrated" into pricing and "dispatch" (scheduling generation units) models, i.e., PJM did not distinguish between virtual UTCs and physical transactions, so that a UTC could affect these functions in the same way as a physical transaction. *Id.* P 20.

---

[2] A "source" is the point of delivery of energy; a "sink" is the point of receipt. Energy flows from the "source" to the "sink." UTCs combine an offer to sell at the source LMP with a bid to buy at the sink LMP in the day-ahead market.

43.     After reviewing the sworn testimony (which it cited throughout the Order) of Chen and

Kevin Gates, the Powhatan investor to whom Chen reported on a daily basis, the Commission

found that Messrs. Chen and Gates understood how arbitrage worked, and why the Commission

permitted UTC transactions, "yet they intentionally placed fraudulent round-trip UTC trades that

did not provide any benefit to the PJM market . . . and that on their own these round-trip trades

would not generate a profit or a loss based on price spreads." *Id.* P 4; *see also* PP 38, 75, 78

(quoting Chen Test. Vol. I Tr. 31:14-18).

### Marginal Loss Surplus and Its Allocation

44.     As discussed above, one of the components of LMP is the cost of the megawatts of

electricity that are lost as the energy is transmitted across the grid. This is called "line loss." As

the Commission has observed, the more demand there is on the grid, the greater the number of

megawatts will be lost in transmission. Order P 23 (citing *Atlantic City Elec. Co., et al. v. PJM*

*Interconnection, L.L.C.*, 115 FERC ¶ 61,132, at PP 3, 5 (2006)). To ensure that customers pay

the true cost of transmitting electricity to their particular location, the Commission required that

the "line loss" component of the LMP reflect the marginal cost, rather than the average cost, of

such losses, although it recognized that "because marginal costs of line losses are greater than

average costs, PJM receives more payments [from purchasers of power] than necessary to

compensate [generators] for actual line losses [i.e., the additional power they supply to make up

for transmission-related losses], resulting in a surplus revenue." *Id.* P 23 (footnotes omitted).

This additional revenue is called "marginal loss surplus."

45.     The Commission directed PJM to develop a method for disbursing the marginal loss

surplus and, in September 2009, approved PJM's proposal to distribute this surplus by a marginal

loss surplus allocation (MLSA) that "paid MLSA on a pro rata basis to network service users and

transmission customers (including virtual traders) in proportion to their ratio shares of the total

MWs of energy: (i) delivered to load in PJM; (ii) exported from PJM; or (iii) cleared in a UTC

transaction that paid for transmission services during such hour." *Id.* P 24 (footnote omitted). In

other words, MLSA was allocated on an hourly basis to UTC traders, in proportion to the volume

of MWs of paid-for transmission that they had reserved in connection with their trades.

46.     As the Commission found with respect to the trades on which it based its penalty

assessment, "communications [between Chen and Powhatan and among the Powhatan investors],

testimony and other evidence demonstrate that Respondents did not engage in UTC trading for

the arbitrage and convergence purposes, but instead to maximize MLSA payments that, but for

their trades, would have gone to other market participants." *Id.* P 70.

## COMMISSION'S INVESTIGATION OF RESPONDENTS

47.     In late July 2010 several market participants informed PJM that they were experiencing

unexpected difficulty in reserving transmission. Following these inquiries, PJM discovered that,

beginning on June 1, 2010, several market participants (including Respondents) had been

reserving large quantities of transmission in OASIS (see ¶ 40 above) associated with high

volumes of UTC bids. Order at P 26. With respect to Respondents, PJM discovered (and

described in its referral letter) that Respondents had been submitting high volume UTC

transactions "in opposite directions between the same two points." *Id.* (quoting PJM Referral).

48.     Enforcement started investigating UTC trading by Respondents (and others) after

reviewing the information in PJM's referral letter and receiving a separate oral referral from

PJM's IMM.[3]  On August 25, 2010, the Commission issued an order of formal investigation. *PJM Up-To Congestion Transactions*, 132 FERC ¶ 61,169 (2010).

49.     During the investigation, Enforcement obtained and reviewed Respondents' emails, trade records, and responses to interrogatories, along with similar materials from PJM, and other participants in the UTC market.  Enforcement analysts reviewed transactional information and Enforcement attorneys took Chen's testimony and the testimony of a number of Powhatan's investors.

50.     Enforcement also studied the multiple submissions from Respondents described below. Enforcement transmitted these records and submissions to the Commission along with its investigative report prior to issuance of the Order.  The Commission cited that evidence throughout its Civil Penalties Order.

51.     In letters to Respondents' respective counsel dated August 9, 2013 (Preliminary Findings Letters), Enforcement informed Respondents that it had preliminarily determined that Respondents had violated the Anti-Manipulation rule; explained the evidence on which it relied; and invited Respondents to respond.

52.     Respondents responded on October 8 and 9, 2013, respectively.  Although Powhatan's response consisted solely of a statement declaring that OE's findings "ma[d]e no sense," Chen, HEEP, and CU Fund provided a substantive response.  In their responses, Respondents did not dispute having executed any of the trades described in the Preliminary Findings Letters.

53.     In September 2014, Enforcement recommended to the Commission that it initiate a public proceeding against Respondents.  Consistent with the Commission's regulations (18

---

[3] The IMM subsequently provided a written referral as well.

C.F.R. § 1b.19 (2014)) Enforcement notified Respondents of this recommendation and again invited a response.

54.    Respondents responded on September 24, 2014. (1b.19 Responses).

55.    After considering Respondents' 1b.19 Responses, Enforcement staff prepared and submitted an investigative report (Staff Report) recommending that the Commission find that Respondents violated the Anti-Manipulation Rule, require disgorgement of unjust profits with interest, and impose civil penalties. (As stated above, the Staff Report is attached hereto as Appendix A to Exhibit 2.) Enforcement transmitted Respondents' 1b.19 Responses to the Commission along with its investigative report.

56.    Pursuant to FPA section 31(d)(1), 16 U.S.C. § 823b(d)(1), on December 17, 2014, the Commission issued an Order to Show Cause and Notice of Proposed Penalty to Respondents, directing Respondents to show cause why the recommended penalties and disgorgement set forth in the Staff Report should not be imposed. *Houlian Chen, Powhatan Energy Fund, LLC, HEEP Fund, LLC, CU Fund, Inc.*, 149 FERC ¶ 61,261 (2014), *revised*, 149 FERC ¶ 61,263 (attached hereto as Exhibit 2).

57.    While Enforcement's Staff Report recommended the Commission issue an Order to Show Cause, the Enforcement staff who investigated this case did not advise the Commission during its deliberations. The Commission's Separation of Functions regulation, Rule 2202, 18 C.F.R. § 385.2202 (2014), prohibits such investigative staff from participating in findings, conclusions, or decisions, except as a witness or counsel in public proceedings.

58.    On January 12, 2015, Respondents notified the Commission of their decision under section 31 of the FPA to waive their opportunity for a trial-type proceeding before an

administrative law judge pursuant to 5 U.S.C. § 554 in favor of a penalty assessment by the Commission with review de novo of that assessment by a federal district court. Order at P 33.

59.     Respondents answered the Order to Show Cause on February 2, 2015. Order at P 33. On February 9, 2015, Chen, HEEP, and CU Fund filed a Supplemental Answer. *Id.* Enforcement Staff replied to the answers on March 3, 2015. *Id.*

## AFTER REVIEWING THE EVIDENCE AND BRIEFING OF THE ISSUES, THE COMMISSION FOUND THAT RESPONDENTS VIOLATED THE ANTI-MANIPULATION RULE

60.     The Commission reviewed the briefs and the extensive administrative record and, on May 29, 2015, issued the Order. In the Order, the Commission found, "[b]ased on the totality of the record in this proceeding, . . . that Respondents' round-trip UTC trading during the Manipulation Period [i.e., June 1, 2010 to August 3, 2010] violated section 222 of the FPA and the Anti-Manipulation Rule." Order at P 4. The Order, attached as Exhibit 1, is expressly adopted and incorporated by reference in this Petition.

### A. Background on Respondents' Business Relationship and Trading.

61.     Chen began trading UTC through HEEP Fund in September 2007. Order at P 11.

62.     In February 2008, Lawrence S. Eiben contacted Chen to propose that Chen provide certain portfolio management services to TFS Capital, LLC. Staff Report at 6. At that time, Eiben was an employee-owner of TFS Capital. *Id.*

63.     TFS Capital and HEEP Fund, through Chen, executed an Advisory Agreement ("First Advisory Agreement") commencing May 1, 2008, pursuant to which Chen agreed to execute, on behalf of TFS Capital, trades identical to the trades he executed on behalf of HEEP Fund, albeit in greater volumes. Order at P 12 (citing Staff Report). As with Chen's later agreement with

Powhatan, TFS Capital compensated Chen based on a percentage of the profits earned by his trades for TFS.  Staff Report at 6-7.

64.     Eventually, another company, Huntrise Energy Fund, LLC (Huntrise), succeeded to TFS Capital's interest in the First Advisory Agreement.  Order at P 12 & n.22 (citing Staff Report at 6-7).  Huntrise, which has since been shut down, was a private investment fund with its principal place of business in Richmond, Virginia.  *Id.*  In June 2008, Chen ceased trading on behalf of TFS Capital and traded UTCs on behalf of Huntrise from June 3, 2008 through May 5, 2010. *Id.*; *see also* Staff Report at 7.

65.     The Commission found that during the period September 2007 to October 2009, Chen traded UTC lawfully, on the basis of "market fundamentals and the models he developed." Order at PP 38-39 nn.87-88.  This trading was characterized by a "careful, low-risk approach" to taking positions in the market.  *Id.* P 39.  The Commission called this "the first phase of Dr. Chen's UTC trading." *Id.*

66.     During autumn 2009, while he traded for HEEP and Huntrise, Chen discovered that his UTC trades had retroactively been credited with MLSA.  *Id.* P 41.  As he analyzed this new information, Chen discovered that credits associated with trades executed in certain predictable periods exceeded the costs of executing those trades during those periods.

67.     The Commission found that this analysis caused Chen, beginning in autumn 2009, to "alter[] his UTC trading strategy away from fundamentals-based spread trading to a strategy designed to capture increased volumes of MLSA payments."  *Id.* P 42.  Thus began what the Commission calls the "second phase" of Chen's UTC trading.  *Id.*

68.     Chen shared this analysis with Powhatan investor Kevin Gates, who in turn shared it with his partners and advised them to "ramp up" their trading volumes.  *Id.* PP 42-43.  Chen disclosed

to Gates that, beginning in February 2010, he had "kicked up" his trading volumes "to target"
MLSA. *Id.* PP 43-44 (quoting Email from Alan Chen to Kevin Gates (Mar. 5, 2010, 9:37 PM)).
Chen and Gates agreed that they wanted to increase their trading volumes in summer 2010 in
order to capture a greater share of the larger MLSA pool available during the "hot summer." *Id.*
P 43 (quoting Chen Test. Vol. I Tr. 94:10-12 (Oct. 7, 2010)).

69.     The Commission found that during this second phase of Chen's UTC trading,
Respondents learned that they could incur substantial losses from transaction costs and price
spread changes but still generate gains due to MLSA. *Id.* P 42. Consequently, Respondents
increased their trading volumes and their focus on MLSA capture. *Id.* PP 42-46.

70.     In early 2010, Chen began implementing a new strategy on behalf of HEEP and Huntrise,
which sought to maximize MLSA capture while minimizing exposure to market prices. This
"correlated pairs" strategy involved identifying closely correlated nodes (i.e., geographically
proximate nodes whose prices tended to move in tandem) and placing trades between them and a
third node. *Id.* P 42. Thus, an A to B trade was paired volumetrically and in the same hour with
a B to C trade. In effect, this created an A to C trade. Because the price spread and volatility
between A and C was expected to be de minimis, profits from the correlated pairs strategy were
derived from the difference between MLSA on the one hand and, on the other, transaction costs
plus spreads (which, again, were expected to be de minimis) between A and C.

71.     In March 2010, Chen explained to Gates that "[w]ithout [MLSA], I would not touch
some of the trades and/or would not put in large volumes for some of the trades. But with
[MLSA] as it is, they are suddenly becoming risk-free (almost to the point) trades." *Id.* P 69 &
n.175 (quoting email from Alan Chen to Kevin Gates (Mar. 5, 2010, 9:37 PM)).

72.     In March 2010, Gates and his fellow investors created a new fund, Powhatan Energy

Fund, LLC. *Id.* P 13. Powhatan is described in paragraph 26, above. The Commission found

that Gates and his fellow investors created Powhatan "[i]n order to 'ramp up' their participation

in this new form of MLSA trading and to avoid the potential liability of having to return MLSA

payments" in the event PJM attempted to reclaim them. *Id.* P 46; *see also* n.108.

73.     In spring 2010, HEEP and Powhatan executed the Powhatan Advisory Agreement, which

superseded the First Advisory Agreement. *Id.* P 13. Under the terms of the Powhatan Advisory

Agreement, Chen agreed to trade UTCs for Powhatan on the basis of a 20-to-1 multiplier: "This

means that for every megawatt that HEEP trades for HEEP's account, HEEP will place trades for

20 megawatts in [Powhatan's] account." Staff Report at 8 (quoting Powhatan Advisory

Agreement). The multiplier in the First Advisory Agreement was 2.5-to-1.

74.     Shortly after Chen began trading for Powhatan, the correlated pairs strategy failed on one

day. A price spike unexpectedly affected only one leg of a correlated pair, which caused a sharp

and unexpected price divergence (i.e., the A node did not experience a spike, but the C node did,

meaning that, contrary to the purpose of the trades, the A to B and B to C price spreads did not

offset). Order at P 47. The net result was that HEEP and Powhatan lost money – in Powhatan's

case, a significant amount, due to the multiplier effect – over the course of only a few hours on

May 30, 2010. *Id.* P 47.

75.     After Respondents' unexpected loss, Chen changed his trading strategy again. *Id.* In this

"third phase" of trading, the Commission found that

> Dr. Chen developed his round-trip UTC trading strategy between the same two
> points (A-to-B, B-to-A). Round-trip trading would effectively eliminate any risk
> of losing (or earning) money based on price spreads because the matched trades'
> price spreads canceled each other out. Dr. Chen's round-trip UTC strategy
> canceled price risk; profits instead came only from collection of MLSA payments,
> which themselves were now collected in a more effective way than they had been

in phase two where some price spread risk was possible if the selected nodes did
not move in tandem.

*Id.* (citation omitted).

76.     In summer 2010, Chen created a second fund, called CU Fund, Inc., for which he traded

UTCs. *Id.* P 14. Because CU Fund was not bound by any advisory agreement with Powhatan,

"Dr. Chen was able to trade UTCs on behalf of CU Fund and collect the associated MLSA

payments solely for his own benefit." *Id.*

77.     Chen did not inform Powhatan about the existence of CU Fund. *Id.* P 14; Staff Report at

29.

78.     For CU Fund, Chen implemented the same round-trip UTC trading strategy that he was

implementing for HEEP and Powhatan, often placing round-trip trades on the same paths in the

same hours for all three funds.

79.     Over the course of the Manipulation Period, Respondents executed approximately 16.6

million MWh of round-trip UTC trades. This amounted to approximately 10% of all

reservations across PJM during that time. Order at P 99. These trades resulted in the

misdirection of approximately $10.1 million of MLSA credits to Respondents. *See* Staff Report

at 32.

**B. The Commission Found that Respondents Engaged in a Manipulative Scheme**

80.     The Commission found that Respondents' conduct was fraudulent and manipulative

because it was deceptive and because it impaired, obstructed, or defeated a well-functioning

market.

81.     The Commission found that Respondents' "round-trip UTC transactions were deceptive

and manipulative" because they involved "plac[ing] separate bids for each leg of their round-trip

UTC transactions in the PJM market, just as other market participants would place routine

arbitrage-based UTC trades. As a result, the two separate legs of Respondents' offsetting trades were not connected and falsely appeared to PJM as legitimate UTC trades, thus concealing their fraudulent nature and purpose." Order at P 5.

82.　　In finding that Respondents' round-trip trades were fraudulent and manipulative because they impaired, obstructed, or defeated a well-functioning market, the Commission noted that "our use of the term 'well-functioning market' is not limited just to consideration of price or economically efficient outcomes in a market." *Id*. P 49. Rather, the Commission "view[s] the term to also broadly include consideration of 'such rules and regulations as the Commission may prescribe as necessary or appropriate,' which necessarily includes the rates, terms, and conditions of service in a market. Here, we find that intentionally subverting the allocation of payment provided by a tariff approved by the Commission constitutes interference with a 'well-functioning market.'" *Id*. P 49 (citing 16 U.S.C. § 824v).

83.　　The Commission found that Respondents' round-trip UTC trades were wash trades: "Respondents' round-trip UTC trades were designed to ensure that both legs of a transaction would cancel each other out, thereby eliminating any associated price risk. As the Commission has previously articulated, trades that are pre-arranged to cancel each other out and involve no economic risk are wash trades, which are inherently fraudulent." *Id*. P 6 (citing *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, 105 FERC ¶ 61,218, at P 53 (2003)).

## C. The Commission Found that Respondents Acted Knowingly and Intentionally

84.　　The Commission found that "the evidence shows that Respondents, individually and together, knowingly and intentionally participated in a manipulative scheme to engage in wash trading and deceive PJM about the true nature of their transactions, thereby harming the market and other market participants." *Id*. P 128.

23

85.     With respect to Respondents Chen, HEEP, and CU Fund, the Commission based its finding of scienter "principally on: (1) evidence that Dr. Chen understood that his fraudulent trading scheme was inconsistent with, and obstructed the market design purpose of, UTC trading in PJM; (2) evidence of the pattern and evolution of Dr. Chen's round-trip UTC trading; and (3) Dr. Chen's deliberate decision to increase profits for himself after perfecting his scheme." *Id.* PP 129-136.

86.     The Commission rejected Respondents' alternative explanation of their purposes, the "home run" strategy. The supposed "home run" strategy was an explanation for Respondents' trading proffered during the investigation and show cause proceeding which hypothesized that the round-trip trades had not been placed for the purpose of capturing MLSA, but rather for the purpose of capitalizing on unforeseeable and unlikely "black swan" type events. *Id.* P 52 & n.124; Staff Report at 42 & n.232. The home run theory suggested that Respondents desired for one leg of a round-trip pair to be rejected in the hopes that the resulting market exposure would result in windfall profits (rather than significant losses). The Commission further found that its determination that Respondents acted with scienter is reinforced by "their creation of a *post hoc* explanation – the home run strategy – for which there is no evidentiary support contemporaneous with the relevant trading conduct." Order at P 129; *see also* PP 86-93 (footnote omitted).

87.     With respect to Powhatan, the Commission based its finding of scienter "on contemporaneous evidence showing its: (1) knowledge and understanding of Dr. Chen's round-trip UTC trading scheme, including the consequences of the scheme; (2) support, increased investment in and encouragement for the scheme; and (3) deliberate actions to increase its profits resulting from the scheme." Order at PP 137-40.

**D. The Commission Found that Respondents' Manipulative Scheme Caused Harm**

88.     The Commission found that Respondents' "communications and testimony show that Respondents understood that their round-trip UTC trades had little price risk by design, were not undertaken to arbitrage price spreads, were certain themselves to lose money, and were placed only to create the illusion of volume trading to obtain transmission and thereby earn MLSA payments that otherwise would have gone to other market participants." *Id.* P 72.

89.     The Commission found that "identifiable market participants were harmed by Respondents' conduct; they did not receive the MLSA payments they would have received absent Respondents' unlawful round-trip UTC trades, as provided for under the then-effective PJM Tariff's MLSA provision." *Id.* P 98.

90.     The Commission further found that "[d]uring the Manipulation Period, Respondents scheduled more than 16.6 million MWh of transmission service in connection with their fraudulent, round-trip UTC trades, which amounted to more than 10 percent of all day-ahead transmission service reservations in PJM." *Id.* P 99.  The Commission concluded that this "impacted the availability of transmission from the time they reserved this transmission service until the time it was released for other market participants' use in the real-time market." *Id.* P 99.

**E. The Commission Found that Respondents' Manipulative Scheme Involved Jurisdictional Transactions.**

91.     The Commission has jurisdiction over Respondents' UTC trading. *Id.* PP 144-148. UTCs are "integral to the operation and settlement of Commission-jurisdictional wholesale markets," and "can affect the outcomes of the settlement of the day ahead physical market." *Id.* P 146 (citation omitted).

92.     Respondents' UTC transactions involved reservation of transmission and "the Commission's jurisdiction over transmission is extremely broad." *Id*. P 147 (citing *New York v. FERC*, 353 U.S. 1, 16-17 (2002)).

93.     The Commission also noted that it has jurisdiction over conduct "in connection with jurisdictional trades" under FPA section 222, 16 U.S.C. §824v(a), and found that Respondents' trades were sufficiently "in connection" with jurisdictional transactions to satisfy the jurisdictional nexus under that provision as well. *Id*. P 148.

94.     Finally, Respondents' UTC trades and the transmission reservations and marginal loss surplus allocation payments associated with them were all implemented pursuant to a Commission-approved tariff by PJM, a Commission-regulated RTO. *Id*. P 145. The Commission must ensure that the terms and conditions embodied in filed tariff provisions that are in connection with jurisdictional transactions are just and reasonable. *Id*. P 144 & n.344 (citing 16 U.S.C. §§ 824d(a) and 824e(a) (2012)).

**F.  The Commission Determined Appropriate Civil Penalties.**

95.     Having concluded that Respondents manipulated the wholesale electric market in PJM, the Commission assessed penalties of $16,800,000 for Powhatan; $10,080,000 for CU Fund; $1,920,000 for HEEP Fund; and $1,000,000 for Chen.

96.     The Commission found these penalties to be statutorily authorized under the FPA and appropriate in this case. *Id*. PP 149-87. The Commission determined that the penalties were well below the statutory maximum authorized in this case. *Id*. P 150.

97.     In determining the appropriate civil penalties for the corporate Respondents (Powhatan, HEEP, and CU Fund), the Commission applied statutory factors and its own Penalty Guidelines.

98.     The statutory factors require the Commission to consider "the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner." *Id*. P 151 (quoting

26

FPA Section 316A(b), 16 U.S.C. § 825o-1(b)). The Commission determined that the violations were serious, and that there was no attempt to remedy the violations in a timely manner. *Id.* PP 186-187 & n.408.

99.     The Commission explicitly applied its non-binding Penalty Guidelines and, in so doing, explained in detail its reasons for concluding that the penalties were reasonable. Pursuant to those guidelines, the Commission considered Respondents' cooperation with the investigation as a mitigating factor. *Id.* PP 163, 173.

100.     The Commission found that it was appropriate to hold Powhatan and HEEP jointly and severally liable for the $1,920,000 penalty assessed against HEEP. *Id.* P 164. The Commission found that "[w]ere we not to adopt joint and several liability, entities engaged in the intentional act of fraud could potentially avoid paying the full penalty and disgorgement amounts. This would be improper." *Id.* P 165 (citing Email from Kevin Gates to Richard Gates (Mar. 21, 2010, 7:55 AM) (noting that if PJM sought to claw back MLSA payments "we'd bankrupt our company and not pay PJM")).

101.     The Commission similarly found that it was appropriate to hold Powhatan and HEEP jointly and severally liable for the $16,800,000 penalty assessed against Powhatan "given the collusion between them." *Id.* P 175.

102.     The Commission's Penalty Guidelines do not apply to individuals. *See* Order at P 155. Therefore, in determining the appropriate civil penalty for Chen, the Commission conducted a "separate penalty analysis" which was "guided by the facts and circumstances of his violations and some of the same factors described in the Penalty Guidelines." *Id.* P 155. In determining the appropriate penalty for Chen, the Commission therefore applied five factors it has previously applied in assessing penalties against individuals: "(1) seriousness of the violation; (2)

commitment to compliance; (3) self-reporting; (4) cooperation; and (5) reliance on Enforcement

Staff guidance." *Id.* P 179.

103.    Applying these factors, the Commission found that

> there is a critical need to discourage and deter the fraudulent conduct at issue and
> that a civil penalty of $1,000,000 is fair and reasonable. We find this civil penalty
> to be particularly appropriate given that Dr. Chen designed and implemented the
> fraudulent scheme and course of business to defraud on behalf of multiple
> entities, and given the widespread scope of and harm caused by his violations.
> Also, Dr. Chen never made any efforts to remedy or cease his violations and
> stopped trading only after being contacted by PJM's IMM.

*Id.* P 187.

## CLAIM FOR RELIEF

104.    The Commission repeats each and every allegation set forth in Paragraphs 1 through 103,

inclusive, as if set forth fully herein.

105.    Respondents used or employed a fraudulent device, scheme, or artifice, or engaged in an

act, practice, or course of business that operates or would operate as a fraud or deceit, with

scienter, in connection with electric energy subject to the jurisdiction of the Commission in

contravention of FPA section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation

Rule, 18 C.F.R. § 1c.2, promulgated to implement that section of the FPA. Respondents'

manipulative scheme involved multiple trades on each of 16 days for CU Fund and 64 days for

HEEP, Powhatan, and Chen. Order at P 150. Each of these separate days, and each

manipulative trade during such days, constitutes a separate violation of FPA section 222, 16

U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2.

106.    Accordingly, the Commission is entitled to an Order from this Court affirming its

assessment of civil penalties against Respondents under FPA section 31, 18 U.S.C. §

823b(d)(3)(B), and ordering Respondents to disgorge their unjust profits.

## JURY DEMAND

107.    The Commission respectfully submits that this Court can and should affirm the penalty assessments without modification following a review of the Commission's Order and the materials presented to the Commission during the penalty assessment process.

108.    Should the Court determine, however, that its review of the Order requires a trial on any issues, the Commission, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands a trial by jury on all issues triable as such.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court:

(A)    Enter an order and judgment affirming the Commission's assessment of a $16,800,000 civil penalty, plus interest, against Powhatan and ordering Powhatan to pay that penalty.

(B)    Enter and order and judgment affirming the Commission's assessment of a $1,000,000 civil penalty, plus interest, against Chen and ordering Chen to pay that penalty.

(C)    Enter an order and judgment affirming the Commission's assessment of a $1,920,000 civil penalty, plus interest, against HEEP and ordering HEEP to pay that penalty.

(D)    Enter an order and judgment affirming the Commission's assessment of a $10,080,000 civil penalty, plus interest, against CU Fund and ordering CU Fund to pay that penalty.

(E)    Enter an order and judgment requiring Powhatan to disgorge $3,465,108 in unjust profits, plus interest, it obtained as a result of its illegal manipulative scheme.

(F)    Enter an order and judgment requiring HEEP to disgorge $173,100 in unjust profits, plus interest, it obtained as a result of its illegal manipulative scheme.

(G)    Enter an order and judgment requiring CU Fund to disgorge $1,080,576 in unjust profits, plus interest, it obtained as a result of its illegal manipulative scheme.

(H)    Grant such other and further relief as the Court may deem just and proper; and

(I)      Retain jurisdiction over this action to enforce any Orders or Final Judgments issued by this Court.


Dated: July 31, 2015

Respectfully submitted,

FEDERAL ENERGY REGULATORY
COMMISSION

Larry Parkinson
Director
Office of Enforcement

Lee Ann Watson
Deputy Director
Office of Enforcement

David A. Applebaum
Acting Director
Division of Investigations

Samuel G. Backfield
Virginia Bar No. 46626
Steven C. Tabackman
Lisa L. Owings
Attorneys for Plaintiff
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC  20426
Telephone: (202) 502-8100
Facsimile: (202) 502-6449