IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FEDERAL ENERGY REGULATORY
COMMISSION,

   Petitioner,

v.              Civil Action No. 3:15cv452

POWHATAN ENERGY FUND, LLC,
HOULIAN "ALAN" CHEN,
HEEP FUND, INC.,

and

CU FUND, INC.,

   Respondents.

## MEMORANDUM OPINION

This matter comes before the Court on cross-briefs filed by Petitioner Federal Energy

Regulatory Commission ("FERC" or the "Commission"), (ECF No. 39), and Respondents

Powhatan Energy Fund, LLC ("Powhatan"), Houlian "Alan" Chen ("Chen"), HEEP Fund, Inc.

("HEEP Fund"), and CU Fund, Inc. ("CU Fund") (collectively, the "Respondents"), (ECF

No. 38). Both briefs discuss, as ordered by the Court, the meaning of this Court's *de novo*

review under Section 31 of the Federal Power Act ("FPA"), codified at 16 U.S.C.

§ 823b(d)(3)(B).[1] (ECF No. 36.) The parties also have submitted supplemental briefs, (ECF

---

[1] 16 U.S.C. § 823b(d)(3)(B) provides:

**(B)** If the civil penalty has not been paid within 60 calendar days after the assessment order has been made under subparagraph (A), the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty. The court shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in Part such assessment.

16 U.S.C. § 823b(d)(3)(B) (footnote omitted).

Nos. 52, 53), filed pursuant to this Court's January 8, 2016 Order, (ECF No. 44), and a great deal

of supplemental authority. (ECF Nos. 55-1, 68, 69, 78, 83, 85, 88-1.) With the Court's leave, a

group of administrative law professors filed a Brief as Amici Curiae, (ECF No. 82), and the

Commission responded, (ECF No. 84). The Court heard oral argument, and the matter is ripe for

disposition. The Court exercises jurisdiction pursuant to 16 U.S.C. § 823b(d)(3)(B) and 28

U.S.C. § 1331.[2] For the reasons that follow, the Court concludes that the Respondents are

entitled to a trial *de novo* governed by the Federal Rules of Civil Procedure and the Federal

Rules of Evidence.

## I. Factual and Procedural Background

### A. Factual Background

In 2010, the Commission's Office of Enforcement ("Enforcement") began investigating

Respondents[3] for engaging in allegedly manipulative and fraudulent energy trading.[4] (Compl. 2,

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

[3] The Respondents consist of Chen and various financial entities on whose behalf Chen traded energy in the summer of 2010, the time period at issue in this case. (Compl. Ex. 1 ("Penalty O."), at 6, ECF No. 1-1.) Chen owns the entirety of Respondents HEEP Fund and CU Fund. (*Id.*)

[4] For purposes of this procedural determination, the Court offers only a brief description of the underlying facts of the allegedly manipulative trading. Respondents conducted financial trades through the wholesale electricity market administered by PJM Interconnection, LLC ("PJM"), an organization that operates various electricity markets throughout the Mid-Atlantic. (Penalty O. at 2, 7.) Certain energy trades qualified market participants to receive a payment, known as a "Marginal Loss Surplus Allocation," or MLSA, which PJM distributed to customers making certain trades. (*Id.* at 3.) FERC alleges here that Respondents "designed and implemented a fraudulent . . . trading scheme to receive excessive amounts of MLSA payments," by manipulating "day-ahead" and "real-time" energy trades to engage in wash trades: "trades that are pre-arranged to cancel each other out and involve no economic risk." (*Id.* at 2–3.)

In August 2010, after two complaints by market participants of someone "gaming the system," PJM submitted a "referral" to Enforcement, tipping off the Commission to the allegedly fraudulent behavior and setting off the investigations that form the basis of this action. (*Id.* at 12.) On January 6, 2011, after conducting its own investigation, PJM's Independent Market

ECF No. 1; Penalty O. at 13.) On August 25, 2010, the Commission issued an order formalizing the investigation. (Penalty O. at 13.) On August 9, 2013, nearly three years later, Enforcement staff issued letters of preliminary findings to Respondents, and "invited Respondents to provide argument or evidence suggesting [that] the preliminary conclusion was incorrect." (Commission Br. 10, ECF No. 39.) Two months later, Respondents replied. (Penalty O. at 14.) On August 5, 2014, the Commission issued a Notice of Alleged Violations. (Penalty O. at 14.)

On December 17, 2014, after failed attempts at settlement, the Commission issued its Order to Show Cause ("OSC"). (Compl. at 3.) The OSC directed Respondents to show cause as to why they should not be found to have violated the statute and regulation forbidding the use of manipulative behaviors in connection with the purchase or sale of electric energy[5]: 16 U.S.C. § 824v(a)[6] and 18 C.F.R. § 1c.2,[7] respectively. (Penalty O. at 14.) The OSC also ordered

---

Monitor submitted an additional referral to Enforcement, again comparing Respondent's actions to wash trades and adding a comparison to Enron's manipulative trading. (Penalty O. 13.)

[5] Congress passed Section 824v as part of the Energy Policy Act, Pub L. No. 90-618 (2005), codified in part at 16 U.S.C. §§ 824v, 825o-1, in response to the "Western Energy Crisis" of 2000 to 2001. *See* Fed. Energy Reg. Comm'n, *Addressing the 2000–2001 Western Energy Crisis*, http://www.ferc.gov/industries/electric/indus-act/wec.asp (last visited Jan. 4, 2016). Congress modeled Section 824v (also known as Section 222 of the FPA) on Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. *See* 16 U.S.C. § 824v(a) (forbidding the use of "any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of Title 15)").

[6] 18 U.S.C. § 824v(a) states, in pertinent part:

It shall be unlawful for any entity . . . , directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers.

18 U.S.C. § 824v(a).

Respondents to elect either a formal hearing before an administrative law judge prior to the assessment of a penalty, pursuant to 16 U.S.C. § 823b(d)(2), or to proceed under 16 U.S.C. § 823b(d)(3)(A), under which the Commission would "promptly" assess penalties upon a finding of violation.[8] (Penalty O. at 15.) No further factfinding occurred after the Commission issued the OSC. Accordingly, the entire record before the Court—to which FERC refers as the "administrative record"—consists of information compiled before the Commission issued the OSC and before Respondents made their penalty assessment election. On January 12, 2015, after the Commission granted Respondents an extension of time, the Respondents each opted for the more immediate penalty assessment and elected to proceed in accordance with § 823b(d)(3)(A). (Compl. ¶ 9; Penalty O. at 16.)

---

[7] 18 C.F.R. § 1c.2(a) states:

(a) It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission,

> (1) To use or employ any device, scheme, or artifice to defraud,
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.

18 U.S.C. § 1c.2(a).

[8] When a respondent has elected to proceed without a full agency hearing pursuant to 16 U.S.C. § 823b(d)(2), "the Commission shall promptly assess such penalty, by order, after the date of the receipt of the notice . . . of the proposed penalty." 18 U.S.C. § 823b(d)(3)(A); *see id.* § 823b(d)(1) (allowing respondent to proceed under 18 U.S.C. § 823b(d)(2) with an agency hearing before an administrative judge or elect to advance under 18 U.S.C. § 823b(d)(3) without such a hearing).

After cross-briefing[9] and a review of the extensive record, the Commission issued its eighty-nine-page Order Assessing Civil Penalties (the "Penalty Order") on May 29, 2015. In the Penalty Order, the Commission found that Respondents had "violated section 222 of the [FPA] and section 1c.2 of the Commission's regulations, which prohibit energy market manipulation, through a scheme to engage in fraudulent Up-To Congestion (UTC) transactions in [PJM's] energy markets to garner excessive amounts of certain credit payments to transmission customers." (Compl. ¶ 10; *see* Penalty O. at 2.) The Commission also determined that the trades engaged in by Respondents constituted "a wash trading scheme in violation of the Commission's prohibition of that practice." (Compl. ¶ 10.) As a result of these findings, and pursuant to 16 U.S.C. § 823b(c),[10] the Commission assessed civil penalties of $16,800,000 against Powhatan; $10,080,000 against CU Fund; $1,920,000 against HEEP Fund; and, $1,000,000 against Chen." (Compl. ¶ 11.) The Commission also directed disgorgement of unjust profits, plus interest, in the amounts of $3,465,108 for Powhatan; $1,080,576 for CU Fund; and, $173,100 for HEEP Fund.

---

[9] On February 2, and February 9, 2015, Respondents provided their answers to the OSC. (Penalty O. at 16.) On March 2, 2015, Enforcement staff responded to Respondents' answers, and Respondents submitted various responses on March 18, 2015, April 1, 2015, April 14, 2015, and April 23, 2015. (*Id.*) Because the March 18, 2015, April 1, 2015, April 14, 2015, and April 23, 2015 filings were not permitted, the Commission did not consider them in its ruling. (Penalty O. 16 nn.72, 73.)

[10] 16 U.S.C. § 823b(c) states, in pertinent part:

**(c) Civil penalty**

Any licensee, permittee, or exemptee who violates or fails or refuses to comply with any rule or regulation under this subchapter, any term, or condition of a license, permit, or exemption under this subchapter, or any order issued under subsection (a) of this section shall be subject to a civil penalty in an amount not to exceed $10,000 for each day that such violation or failure or refusal continues. Such penalty shall be assessed by the Commission after notice and opportunity for public hearing.

16 U.S.C. § 823b(c).

After Respondents failed to pay the penalties within 60 days, pursuant to

§ 823b(d)(3)(B),[11] the Commission filed the action in this Court. FERC demands a jury trial, if

the Court finds that the statute allows such a trial. (Compl. ¶¶ 1, 29.)

### B.    Procedural Background

After FERC filed this action, Respondents filed motions to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6).[12] Respondent Powhatan argued that it did not receive "fair

notice" that the Commission would consider the trades at issue illegal because the Commission

had not previously listed the *specific* types of trades engaged in as unlawful. (ECF No. 20.)

Respondents Chen, HEEP Fund, and CU Fund posed a similar argument in their motion to

dismiss, but further focused on: whether the Complaint alleges fraud with specificity; whether

the statute of limitations bars much of the Commission's claims; and, whether the Commission

could bring such an action and penalty against Chen, an individual. (ECF No. 22.)

Powhatan's memoranda in support of its motion to dismiss failed to address the

procedural requirements of this case, specifically, what procedures the Court must follow in

conducting the "review de novo [of] the law and the facts involved" required by § 823b(d)(3)(B).

(*See* ECF Nos. 20, 21, 33.) Likewise, FERC's response to Powhatan's motion neglected to take

up that threshold issue. (*See* ECF No. 28.) The memoranda in support of and opposition to

Chen, HEEP Fund, and CU Fund's motion only briefly addressed the Court's procedure and the

standard of review. (Chen Mem. Supp. Mot. Dismiss 4–7, ECF No. 23; FERC Resp. Chen Mot.

Dismiss 29, ECF No. 29; Chen Reply Mot. Dismiss 3 n.1, 4–8, ECF No. 34.) Because the

---

[11] 16 U.S.C. § 823b(d)(3)(B) states in part: "(B) If the civil penalty has not been paid within 60 calendar days after the assessment order has been made under subparagraph (A), the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty." 16 U.S.C. § 823b(d)(3)(B).

[12] Federal Rule of Civil Procedure 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

procedure the Court follows in conducting its "review de novo [of] the law and the facts involved" necessarily will impact the lens through which it views the motions to dismiss, the Court ordered the parties to submit briefing "detailing the respective party's position regarding the procedure mandated by 16 U.S.C. § 823b(d)(3)(B)." (ECF No. 36.)

After the parties submitted cross-briefs discussing the meaning of this Court's *de novo* review procedure under § 823b(d)(3)(B), the Court denied the motions to dismiss without prejudice and ordered additional briefing. (ECF No. 44.) The parties then filed their respective supplemental briefs.[13] (ECF Nos. 52, 53.)

## II. Analysis

This matter presents an issue of first impression in this District, and one which neither the Supreme Court of the United States nor the United States Court of Appeals for the Fourth Circuit has addressed.[14] The Court must determine whether, as Respondents contend, 16 U.S.C. § 823b(d)(3) entitles Respondents to a *de novo* trial governed by the Federal Rules of Civil Procedure and the Federal Rules of Evidence,[15] or whether, as FERC contends, § 823b(d)(3)

---

[13] Respondents subsequently sought leave to file a second supplemental brief, (ECF No. 54), which FERC opposed, (ECF No. 59). Despite FERC's objection, in the interests of justice, the Court will consider all supplemental authority and briefs submitted, including Respondents' second supplemental brief, and the subsequent filings submitted by each party. (ECF Nos. 54-1, 68, 69, 70, 78, 79, 80, 82, 83, 84, 85, 88-1.)

[14] The Court also is unable to find on-point decisions from any other United States Courts of Appeal, and the parties have identified none. To date, five federal district courts have decided the issue. *Fed. Energy Regulatory Comm'n v. Barclays Bank PLC*, 247 F. Supp. 3d 1118 (E.D. Cal. 2017); *Fed. Energy Regulatory Comm'n v. Etracom, LLC*, No. 2:16cv01945, 2017 U.S. Dist. LEXIS 33430 (E.D. Cal., Mar. 7, 2017); *Fed. Energy Regulatory Comm'n v. Silkman*, 233 F. Supp. 3d 201 (D. Maine 2017); *Fed. Energy Regulatory Comm'n v. City Power Marketing, LLC*, 199 F. Supp. 3d 218 (D.D.C. 2016); *Fed. Energy Regulatory Comm'n v. Maxim Power Corp.*, 196 F. Supp. 3d 181 (D. Mass. 2016).

[15] At oral argument, Respondents clarified that they do not claim entitlement to a trial regardless of how pretrial matters transpire. (Transcript 29:1–12, ECF No. 65.) Rather, Respondents posited that they would be entitled to the *civil process* leading up to a trial, as

merely grants the Court the "discretion to craft the procedure that will best facilitate its review," (FERC Br. 2, ECF No. 39). The Court concludes, consistent with other district courts to decide this issue,[16] that the language and structure of the statute and principles of due process entitle Respondents to a *de novo* trial governed by the Federal Rules of Civil Procedure and the Federal Rules of Evidence.[17]

## A.     Principles of Statutory Interpretation Must Guide the Court's Analysis

The Court must employ traditional principles of statutory interpretation to determine what procedure is required when conducting a "review de novo" under § 823b(d)(3)(B). The purpose of statutory interpretation is "to try to determine congressional intent." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990). The analysis must "begin, as always, with the language of the statutory text," and "[i]n the absence of a definition from Congress, [the Court] accord[s] words in a statute their ordinary, contemporary, common meaning." *United States v. Midgett*, 198 F.3d 143, 145–46 (4th Cir. 1999) (internal citation and quotation marks omitted).

---

governed by the Federal Rules of Civil Procedure. As with any civil case, Respondents explained, if the Court were to find in their favor, the Commission's action should be subject to pretrial motions, such as motions to dismiss or motions for summary judgment. The Court acknowledges that if Respondents were entitled to a trial, resolution of the case could occur prior to a full trial. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) (explaining that many procedural devices that diminish "the civil jury's historic domain have been found not to be inconsistent with the Seventh Amendment"). This does not, however, alter the Court's characterization of the issue at bar: whether Respondents have the right to a trial under 16 U.S.C. § 823b(d)(3).

[16] Each of the five district courts to decide the issue has held that its respective defendants "are entitled to conduct discovery under the Federal Rules of Civil Procedure." *Barclays Bank*, 247 F. Supp. 3d at 1119 (collecting and citing cases).

[17] Respondents assert that they are entitled to a *jury* trial in this case. Because of the possibility that this action could be resolved before the Court need decide the issue, the Court declines to rule on Respondents' entitlement to a jury. *See City Power*, 199 F. Supp. 3d at 233 ("If [a party] is entitled to summary judgment, [any] theoretical right to a jury trial is irrelevant, for there will be no trial whatsoever.").

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Thus, the Court must look to the statute as a whole in determining the meaning of individual words because "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *see also Dole*, 494 U.S. at 35 ("[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal citation and quotation marks omitted).

When "the terms of a statute are unambiguous on their face, or in light of ordinary principles of statutory interpretation," judicial inquiry normally ends. *United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988). But if the "terms of a statutory provision are ambiguous [the Court may] consider other evidence to interpret the meaning of the provision, including the legislative history and the provision's heading or title." *United States v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009) (citing *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)). At base,

> [i]f the language is ambiguous, in that it lends itself to more than one reasonable interpretation, [the court's] obligation is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested.

*United States v. Joshua*, 607 F.3d 379, 384 (4th Cir. 2010). Finally, under the doctrine of constitutional avoidance, if a statute is susceptible to more than one reasonable construction, courts should choose an interpretation that avoids raising constitutional problems. *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.").

9

**B.** **The Language of the Statute**

The Court begins, as it must, "with the language of the statutory text," and gives those words undefined by Congress[18] "their ordinary, contemporary, common meaning." *See Midgett*, 198 F.3d at 145–46. In interpreting the statute's text, the Court does not rely on "a single sentence or member of a sentence, but look[s] to the provisions of the whole law, and to its object and policy," *Dole*, 494 U.S. at 35 (internal citation and quotation marks omitted), and determines the language's meaning "by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole," *Robinson*, 519 U.S. at 341. The language of the statute, taken as a whole and interpreted in light of the context in which it is used makes plain that this Court should conduct a trial *de novo* on this matter governed by the Federal Rules of Civil Procedure and the Federal Rules of Evidence.[19]

### 1. The Two Procedural Pathways in Section 31(d)

FPA Section 31(d), which governs the assessment of penalties in this case, creates two procedural pathways by which a penalty may be imposed. In both cases, the Commission first issues a notice of the proposed penalty to the alleged wrongdoer. 16 U.S.C. § 823b(d)(1). Under the first pathway, to which the Court will refer as the "Default Option,"

> the Commission shall assess the penalty, by order, after a determination of violation has been made on the record after an opportunity for an agency hearing pursuant to [5 U.S.C. § 554, the Administrative Procedure Act,] before an administrative law judge appointed under section [5 U.S.C. § 3105]. Such

---

[18] The FPA includes a "Definitions" section, *see* 16 U.S.C. § 796, but that section contains no definitions relevant to the question currently before the Court.

[19] As explained below, the Court does not determine that the mere statutory *words* clearly and unambiguously indicate that the statute mandates a trial *de novo*. Rather, considering the statute *as a whole*, the Court finds the statute unambiguous regarding the scope of review this Court must perform. *See, e.g., King*, 502 U.S. at 221 (1991) (holding that "the meaning of statutory language, plain or not, depends on context").

> assessment order shall include the administrative law judge's findings and the
> basis for such assessment.

16 U.S.C. § 823b(d)(2)(A).

After the formal hearing before the administrative law judge ("ALJ"), "[a]ny person against whom a penalty is assessed" under the Default Option may "institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order in accordance with chapter 7 of Title 5," which governs the procedures for judicial review of agency actions. 16 U.S.C. § 823b(d)(2)(B); *see also* 5 U.S.C. §§ 701 *et seq.* (setting forth the procedures governing judicial review of agency action). Under the Default Option, the court of appeals has "jurisdiction to enter a judgment affirming, modifying, or setting aside in whole or in [p]art, the order of the Commission." 16 U.S.C. § 823b(d)(2)(B) (footnote omitted). The court of appeals may also "remand the proceeding to the Commission for such further action as the court may direct." *Id.* If "any person fails to pay an assessment of a civil penalty after it has become a final and unappealable order" under the Default Option, "the Commission shall institute an action to recover the amount of such penalty in any appropriate district court of the United States." 16 U.S.C. § 823b(d)(5). In that action, the "validity and appropriateness of such final assessment order or judgment shall not be subject to review." *Id.* And in proceedings under the Default Option, "[t]he Commission shall be represented by the Attorney General, or the Solicitor General, as appropriate." 16 U.S.C. § 823b(d)(6)(B).

The Default Option "thus describes a traditional form of judicial review of agency action, based on the record developed in an agency proceeding," *City Power*, 199 F. Supp. 3d at 230, governed at each step by the relevant section of the Administrative Procedures Act, utilizing appellate lawyers to conduct the litigation, and relying on federal district courts to enforce final assessments.

The second pathway, to which the Court will refer as the "Alternate Option," requires the alleged wrongdoer to "elect in writing within 30 days after" receiving the notice of proposed penalty to have the Alternate Option procedures—rather than the Default Option procedures—apply. 16 U.S.C. § 823b(d)(1). Under the Alternate Option, "the Commission shall promptly assess such penalty, by order." 16 U.S.C. § 823b(d)(3)(A). After the penalty has been assessed, if it

> has not been paid within 60 calendar days . . . , the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty. The court shall have authority to *review de novo the law and the facts involved*, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art such assessment.

16 U.S.C. § 823b(d)(3)(B) (emphasis added) (footnote omitted).

If "any person fails to pay an assessment of a civil penalty" after the "district court has entered final judgment in favor of the Commission" under the Alternate Option, "the Commission shall institute an action to recover the amount of such penalty in any appropriate district court of the United States." 16 U.S.C. § 823b(d)(5). In that action, the "validity and appropriateness of such final assessment order or judgment shall not be subject to review." *Id.* In proceedings under the Alternate Option, "the Commission may be represented by the general counsel of the Commission (or any attorney or attorneys within the Commission designated by the Chairman) who shall supervise, conduct, and argue any civil litigation to which [the Alternate Option applies] in a court of the United States or in any other court, except the Supreme Court." 16 U.S.C. § 823b(d)(6)(A).

The Alternate Option thus "sets out a less familiar path" than the Default Option. *City Power*, 199 F. Supp. 3d at 230. Under the Alternate Option, no procedural requirements apply to the order assessing penalties except that it be "promptly assessed," 16 U.S.C. § 823b(d)(3)(A);

proceedings are not governed by the Administrative Procedures Act; the district court has no authority to remand the proceeding to the Commission; and the "civil litigation" may be conducted by "any attorney or attorneys within the Commission," 16 U.S.C. § 823b(d)(6)(A).

As discussed, Respondents chose the Alternate Option and did not pay the assessment within sixty days. The Court now must determine what specific procedures govern this "action in the appropriate district court" instituted by FERC.

## 2. The Relevant Statutory Phrases in the Alternate Option

The Court must determine what procedures it should employ to "review de novo the law and the facts involved" in this case. Respondents claim entitlement to a *de novo* trial, while FERC contends that the Court has the flexibility to craft a limited but effective procedure to conduct its review. The Court begins its analysis by examining the governing statutory phrases.

### a. "Institute an Action"

Under the Alternate Option, after the Commission has "promptly assess[ed]" a penalty by order, and the alleged wrongdoer has not paid the assessment within sixty days, the Commission "shall institute an action" in a district court for an order affirming the assessment. 16 U.S.C. § 823b(d)(3)(B). The Court looks first to the phrase "institute an action" to see what, if any, light it sheds on the procedures the Court must utilize in this case.

The Federal Rules of Civil Procedure "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81."[20] Fed. R. Civ. P. 1. "[T]he Federal Rules of Civil Procedure provide the normal course for beginning, conducting, and determining controversies." *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 406 (1960) (internal citation omitted). Although summary disposition "of controversies over property and

---

[20] Rule 81 contains exceptions to the general rule, but none that apply in this case. *See* Fed. R. Civ. P. 81.

13

property rights is the exception in [the United States'] method of administering justice," *id.*, Congress, through "express statutory authorization," has the power to "allow proceedings more summary than the full court trial," *id.* at 407 n.6. To do so, however, there must be a "clear expression of congressional intent to exempt actions . . . from the operation of the Federal Rules of Civil Procedure." *Califano v. Yamasaki*, 442 U.S. 682, 700 (1979). No such clear exemption exists here.

However, Congress's mere use of the word "action" in § 823b(d)(3) does not, in itself, require that this Court apply the Federal Rules of Civil Procedure to this case. The Supreme Court of the United States, and even the Federal Rules themselves, contemplate that the Civil Rules may not always "apply to summary proceedings created by statute." Fed. R. Civ. P. 1 advisory committee's note to 2007 amendment; *see also Scanlon*, 362 U.S. at 407 n.6 (citing examples of "express statutory authorization" for summary proceedings in place of a "full court trial").

Further, Congress also used the phrase "institute an action" to describe the procedure a person against whom a penalty was assessed under the Default Option takes. 16 U.S.C. § 823b(d)(2)(B) ("Any person against whom a penalty is assessed under [the Default Option] may . . . institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order . . . ."). Neither party contends that a proceeding in the court of appeals would be governed by the Federal Rules of Civil Procedure, nor would it make any sense for Congress to have devised such a scheme.[21] Finally, "Congress has in other cases

---

[21] The Default Option expressly requires "judicial review of [the penalty assessment order] in accordance with chapter 7 of Title 5," 16 U.S.C. § 823b(d)(2)(B), which governs the procedures for judicial review of agency actions. Under the Default Option, judicial review occurs in a United States court of appeals, *see id.*, meaning that the Federal Rules of Appellate Procedure, rather than the Federal Rules of Civil Procedure, would govern the judicial review,

called for the institution of 'a civil action' to review an administrative decision, while limiting that review to the administrative record." *Barclays Bank*, 247 F. Supp. 3d at 1136 (citing 42 U.S.C. § 405(g) (setting forth the procedures for judicial review of a "final decision of the Commissioner of Social Security")).

Thus, although the statute governing the procedures under the Alternate Option contains no express exemption from operation of the Federal Rules of Civil Procedure, neither is it clear, simply from Congress's use of the word "action" to characterize the proceeding, that the Default Option *must* be governed by the Federal Rules of Civil Procedure.

### b. "Review de Novo"

Regarding "review de novo," FERC argues that "the concept of a review is incompatible with [a] plenary trial proceeding." (FERC Br. 11, ECF No. 39.) "Had Congress intended to require a trial, it could have done so," and indeed "has done exactly that in providing for *trial* de novo under other statutes." (*Id.*) FERC points to at least five statutes[22] in which Congress used the phrase "trial de novo" to describe proceedings at the district court level, and argues that "[h]ere, Congress mandated a 'review,' not a 'trial,' and there is no support in the text of the FPA for redefining 'review' to *require* a 'trial.'" (*Id.* at 11–12, 12 n.10.)

---

*see* Fed. R. App. P. (1)(a) (stating that the Federal Rules of Appellate procedure "govern procedure in the United States courts of appeal").

[22] The Food Stamp Act, 7 U.S.C. §§ 2011 *et seq.*, provides that judicial review of an agency determination "shall be a trial de novo by the court." 7 U.S.C. § 2023(a)(15). The laws governing employees' health benefits plans provide that an action reviewing the assessment of a civil penalty shall be a "trial de novo" if the party seeking review so requests. 42 U.S.C. § 300e-9(d)(3). An employee seeking judicial review of the Merit Systems Protection Board's decisions on cases of discrimination has "the right to have the facts subject to trial de novo by the reviewing court." 5 U.S.C. § 7703(c)(3). A party seeking judicial review of an arbitration award "may file a written demand for a trial de novo in the district court." 28 U.S.C. § 657(c)(1). And a suit for the recovery of a forfeiture "shall be a trial de novo." 47 U.S.C. § 504(a).

Respondents counter that the Supreme Court of the United States and the Fourth Circuit have each, in different contexts, interpreted statutes providing for *de novo* review as allowing a plenary trial. (Resps.' Br. 15–16, ECF No. 38.) Respondents also point to "other statutes [that] include identical 'review de novo' language in civil penalty schemes," and argue that the legislative history of those statutes shows that "Congress intended to provide for a 'trial de novo.'"[23] (*Id.* at 15 n.13.) Thus, although Respondents do not assert that the review *de novo* language alone *necessarily* mandates a plenary trial, they contend that "[t]he statutory phrase 'review de novo' . . . is fully consistent with a plenary adjudication in district court." (*Id.* at 18, ECF No. 38.)

It is clear that, "'[b]y definition, de novo review entails consideration of an issue as if it had not been decided previously.'" *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 246 (4th Cir. 2009) (alteration in original) (quoting *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992)); *see also Doe v. United States*, 821 F.2d 694, 697–98 (D.C. Cir. 1987) ("De novo means here, as it ordinarily does, a fresh independent determination of 'the matter' at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion."). Thus, "[t]he words 'review' and 'trial' might conceivably be

---

[23] The Atomic Energy Act (the "AEA"), 42 U.S.C. §§ 2011 *et seq.*, includes a penalty assessment provision substantially identical to the two-option provision at issue here. *See* 42 U.S.C. § 2282a(c). The legislative history of the AEA includes the statement that "[a]ny person subject to such penalty under this amendment may elect administrative assessment of the penalty by the Secretary after opportunity for an agency hearing before an administrative law judge, or a *trial de novo* in the appropriate district court of the United States." S. Rep. No. 100-70, at 23 (1988) (emphasis added).

The Natural Gas Policy Act of 1978 (the "NGPA"), 15 U.S.C. §§ 3301 *et seq.*, contains a provision for judicial review of a civil penalty assessment that is also substantially identical to the language of the Alternate Option. *See* 15 U.S.C. § 3414(b)(6)(F). The NGPA's legislative history states that the law gives the Commission "authority to assess civil penalties [and] [v]iolators may obtain review of the Commission's assessment through a *trial de novo* in federal district court." H.R. Conf. Rep. No. 95-1752, at 121 (1978) (emphasis added).

used interchangeably," and a statute requiring a court to conduct a *de novo* review means "that the court should make an independent determination of the issues." *United States v. First City Nat'l Bank*, 386 U.S. 361, 368 (1967).

These observations, unfortunately, merely validate both parties' assertions that the Court must make its own determination about the law and the facts involved. The pivotal issue, therefore, becomes what comprises "the law and the facts involved" that the Court reviews *de novo*.

### c. "The Law and the Facts Involved"

FERC argues that "the law and the facts involved," which this Court reviews *de novo* are "the extensive factual and legal findings in the Commission's Order and the substantial documentary and testimonial evidence contained in the Administrative Record." (FERC Br. 8.) Citing similar language in the Natural Gas Act and the Clean Water Act, FERC asserts that the phrase "shall have authority" in the Alternate Option "places no restrictions or limitations on how the Court" reviews the Commission's penalty assessment order. (*Id.* at 7.) According to FERC, "should the Court decide that additional fact finding is required on a discrete issue, the Court is free to permit limited discovery, testimony, argument, etc., on that discrete issue." (*Id.*)

Respondents counter that "FERC's effort to limit this action to what it terms the administrative record is . . . foreclosed because, under the plain language of [S]ection 31(d)(3), FERC is not authorized to . . . create an administrative record if a party elects an action in federal district court." (Resps.' Br. 11.) Asserting that "[w]hen a statute contemplates the creation of an administrative record, it clearly says so," (*id.*), Respondents argue that no administrative record can exist in this case because

> the language creating judicial procedures under [S]ection 31(d)(3) never refers to, or authorizes FERC to create, an administrative record. Nor does [S]ection

17

31(d)(3) authorize FERC to make [a] "determination of violation" . . . . If
Congress wanted the district court option to be limited to an appellate-style
review of an administrative record, it would have said so.

(*Id.* at 12.)

Three characteristics of the statute convince the Court that its review *de novo* of "the law

and the facts involved" requires an ordinary civil action governed by the Federal Rules of Civil

Procedure and the Federal Rules of Evidence. First, and most importantly, the differences

between the proceedings under the Default Option and the Alternate Option strongly indicate

that Congress intended the district court's *de novo* review to be a plenary trial. Second, under

the Alternate Option, no administrative record in the ordinary sense is ever created—which

would leave the Court with no consistent standard by which to determine what constitutes "the

law and the facts involved." And third, the potential for due process violations exists if the Court

did not conduct its review *de novo* as an ordinary civil action.

### i. The Differences Between Default Option Proceedings and Alternate Option Proceedings

Significant differences between the proceedings under the Default Option and the

proceedings under the Alternate Option persuade the Court that it must conduct its *de novo*

review as an ordinary civil action governed by the Federal Rules of Civil Procedure and the

Federal Rules of Evidence. Although both the Default Option and the Alternate Option use the

phrase "institute an action" to describe how the review proceedings are begun, the "action" in the

Default Option differs in at least five important ways.

First, the Default Option provides for review of the agency's penalty assessment in a

United States court of appeals, but the Alternate Option "places judicial review in a district court,

where factual development through discovery is the norm." *City Power*, 199 F. Supp. 3d at 231.

Although not dispositive in this situation, the presumption that the Rules of Civil Procedure

govern all actions in district courts, *see* Fed. R. Civ. P. 1, is persuasive evidence that the "action" instituted in the district court under the Alternate Option is different in kind than the "action" instituted in the court of appeals. "By its terms, [§ 823b(d)(3)(B)] imposes [no] unique evidentiary limits in district court proceedings." *Kappos v. Hyatt*, 132 S. Ct. 1690, 1696 (2012). When a district court considers new evidence, "it must act as a factfinder"; it "must make its own findings *de novo* and does not act as the 'reviewing court' envisioned by the APA." *Id.*

Second, the person against whom the Commission assessed a penalty initiates the "action" in the Default Option, which is consistent with how a typical appellate process unfolds: the party asserting error in the original decision institutes the appeal. *See* 16 U.S.C. § 823b(d)(2)(B) ("*Any person against whom a penalty is assessed* under this paragraph may . . . institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order . . . .") (emphasis added). But the Commission initiates the "action" in the Alternate Option, which is consistent with how normal civil trials unfold in a district court: the party seeking affirmative relief institutes the action. *See* 16 U.S.C. § 823b(d)(3)(B) ("If the civil penalty has not been paid . . . , *the Commission shall institute an action* in the appropriate district court of the United States for an order affirming the assessment of the civil penalty.") (emphasis added).

Third, and relatedly, the statute provides that "[t]he Commission shall be represented by the Attorney General, or the Solicitor General, as appropriate, in actions under [the Default Option]," 16 U.S.C. § 823b(d)(6)(B), but expressly provides that "general counsel of the Commission (or any attorney or attorneys within the Commission designated by the Chairman) . . . shall supervise, conduct, and argue any civil litigation to which [the Alternate Option] applies," 16 U.S.C. § 823b(d)(6)(A). Thus, the statute requires that attorneys who specialize in

appellate litigation shall represent the Commission in court proceedings in the Default Option, but does not require specialized appellate attorneys to represent the Commission in the "civil litigation" under the Alternate Option.

Fourth, the statute expressly provides that the appeal under the Default Option is conducted according to the APA, while the action instituted in the district court under the Alternate Option includes no such requirement. More specifically, the Default Option provides that a person against whom a penalty is assessed may institute an action "*for judicial review* of [the penalty assessment order] in accordance with chapter 7 of Title 5," which governs the procedures for judicial review of agency actions. 16 U.S.C. § 823b(d)(2)(B); *see also* 5 U.S.C. §§ 701 *et seq.* (setting forth the procedures governing judicial review of agency action). Thus, the Default Option not only explicitly states that the court of appeals shall conduct a "judicial review" of the penalty assessment order, but that its judicial review shall be conducted pursuant to and governed by the procedures in the APA.

The Alternate Option, on the other hand, includes nothing about "judicial review" and does not reference any section of the APA. Instead, the Alternate Option refers to "an action" in a "district court" for an "order affirming the assessment of the civil penalty." 16 U.S.C. § 823b(d)(3)(B). These important differences—the inclusion of language in one part of the statute and the omission of the same language in another part of the statute—provide further contextual evidence that the proceedings in the district court under the Alternate Option amount to more than a mere review of the factfinding that occurred at the agency level, and require the district court to conduct additional factfinding of its own. *See In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) ("Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce

some terms to mere surplussage.") (quoting *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004)). If the Court interpreted both actions to be actions of "judicial review" that were governed by the APA, the inclusion of the "judicial review" language in the Default Action could amount to "mere surplussage." *See id.*

Fifth, and finally, the Default Option gives the court of appeals the option of remanding the proceeding to the agency, while the Alternate Option provides no such option. The absence of an option to remand to the agency for additional action supports the interpretation of the Alternate Option as providing for a trial *de novo* in the district court in which the district court conducts additional factfinding. *See Kappos*, 132 S. Ct. at 1697 ("[The statute], moreover, does not provide for remand to [the agency] to consider new evidence, and there is no pressing need for such a procedure because a district court, unlike a court of appeals, has the ability and the competence to receive new evidence and to act as a factfinder.").

### ii.    The Lack of an Administrative Record

FERC asserts that the Court's review *de novo* should be limited to "a review of the Commission's [Penalty Order] based on the administrative record." (FERC Br. 30.) According to FERC, the "administrative record" in this case "consists of the materials filed by the Commission's Enforcement litigation staff and by Respondents in the Show Cause Proceeding as well as the Commission's orders issued in that proceeding," and the Commission's Penalty Order.[24] (Not. Filing Administrative R. 3, ECF No. 37.)

---

[24] By the Court's count, FERC's proposed "administrative record" includes at least 14,395 pages. (*See* Index of Administrative R. 1–21, ECF No. 37-1.) It "consists of the materials filed by the Commission's Enforcement litigation staff and by Respondents in the Show Cause Proceeding as well as the Commission's orders issued in that proceeding." (*Id.* at 3.) It appears, however, that it does not include the entire investigative record, and the Court has no ability to discern what products of the investigation FERC omitted or why.

Typically, the APA "requires that some record be compiled in a formal . . . adjudicatory proceeding," and by statute "identifies the substance of the record." 6 Administrative Law, § 52.04 (2017). A court reviewing an agency decision generally must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The "record" which the court reviews consists of "[t]he transcript of testimony and exhibits [taken during the hearing], together with all papers and requests filed in the proceeding." 5 U.S.C. § 556(e).

The statute governing the Court's procedures under the Alternate Option includes no reference to an "administrative record," either expressly—by referring to a governing "administrative record"—or implicitly—by, for example, referring to the Administrative Procedures Act. *See Barclays Bank*, 247 F. Supp. 3d at 1129 ("[T]he applicable statute makes no mention of an 'administrative record.'"). The Court cannot find, and neither party cites, any regulations or policy statements by the Commission that define the applicable "administrative record" under the Alternate Option procedures. *See, e.g.*, 18 C.F.R. §§ 1b.1 *et seq.* ("Rules Relating to Investigations"); 18 C.F.R. §§ 385.101 *et seq.* ("Rules of Practice and Procedure"); *see also Barclays Bank*, 247 F. Supp. 3d at 1129 ("FERC's regulations, and its policy statements also make no mention of an administrative record.")

Perhaps more importantly, once a party elects to proceed under the Alternate Option, in stark contrast to proceedings under the Default Option, *no additional factfinding occurs*. A party elects to proceed under the Alternate Option after the Commission "provide[s] to such person notice of the proposed penalty." 16 U.S.C. § 823b(d)(1). That notice, however, is not provided until after an elaborate and often lengthy investigatory process the Commission conducts as an

*enforcer*, not as a neutral arbiter.[25]  Accordingly, "the only statutory difference between the two available procedures is the election itself.  That is because the election occurs *after* the full 'administrative record' has been compiled." *Barclays Bank*, 247 F. Supp. 3d at 1126.

First, "[p]rior to opening an investigation, [Enforcement] staff . . . typically conducts a preliminary examination of the identified activity." 123 FERC 61,156, P 24.  If the Enforcement staff "determines that a fuller inquiry into the subject conduct is required," an investigation is opened. *Id.*  If an investigation is opened, Enforcement staff "will notify the subject of that fact." *Id.* at P 26.

Once an investigation is opened, Enforcement staff conducts factfinding "through customary discovery methods such as data and document requests, interrogatories, interviews, and depositions." *Id.* at P 28, 18 C.F.R. § 1b.13.  During this process, the subject of the investigation may "provide additional information or explanations of their conduct." *Id.* (citing 18 C.F.R. § 1b.18 ("Any person may, at any time during the course of an investigation, submit documents, statements of facts or memoranda of law for the purpose of explaining said person's position or furnishing evidence which said person considers relevant regarding the matters under investigation.")).  The subject of the investigation does not, however, have reciprocal—or adversarial—discovery rights during the investigation.

If, after the investigation, Enforcement staff "reaches the conclusion that a violation occurred that warrants sanctions," the subject of the investigation is notified, either orally or in writing. *Id.* at P 32.  The subject again "has an opportunity to respond and to furnish any additional information it may deem to be helpful." *Id.*  This opportunity is limited in form,

---

[25] In this case, more than four years passed between the time Enforcement began its investigation of Respondents and the time Respondents were provided notice of the proposed penalty under 16 U.S.C. § 823b(d)(1). (*See* Commission Br. 3–4.)

however. The subject of an investigation has "no authority to compel the production of evidence or testimony," nor can the subject "compel any witness to give an affidavit [] or a deposition, or . . . submit to cross-examination." *See Barclays Bank*, 247 F. Supp. 3d at 1121 n.7, 1129. The matter then follows "one of two courses": the parties either agree to a settlement, "or the subject contests Enforcement's conclusions." *Id.*

If the subject of the investigation does not wish to settle, in almost all cases, "Enforcement staff . . . notifies each subject of an investigation of its intention to" recommend enforcement proceedings, which is done via an Order to Show Cause. *Id.* at P 35. The subject of the investigation then has the opportunity to "present its case as to why an Order to Show Cause should not issue." *Id.* Enforcement staff submits to the Commission its recommendations and "the subject's response to the Order to Show Cause," and "the Commission determines whether an Order to Show Cause is appropriate." *Id.* at P 36. If the Commission issues an Order to Show Cause, it commences a "Part 385 proceeding." *Id.* at P 37.

Only after all this has occurred does the Commission "provide to such person notice of the proposed penalty" and the opportunity to elect to proceed under either the Default Option or the Alternate Option. 16 U.S.C. § 823b(d)(1).

> Thus, regardless of which election is made, Enforcement has already conducted the investigation, issued its preliminary findings and invited responses, conducted settlement negotiations, issued its notice of alleged violations, issued its 1b.19 letter and invited responses. In addition, regardless of the election, FERC has already issued its Order To Show Cause, and invited Defendants to file Answers.

*Barclays Bank*, 247 F. Supp. 3d at 1126. If the party elects the Alternate Option, the Commission "shall promptly assess [the] penalty." 16 U.S.C. § 823b(3)(A). Thus, once a party elects the Alternate Option, the Commission "determines—*without obtaining any additional*

*evidence or argument*—whether a violation exists."[26] *Barclays Bank*, 247 F. Supp. 3d at 1126.

FERC identifies "nothing in the statute, regulation, or policy statement that requires [the

Commission] to act as a neutral decision-maker" when making its penalty assessment under the

Alternate Option.[27] *See id.* at 1136. Nor does the statute require that the Commission meet any

evidentiary standard, such as a preponderance, before assessing a penalty. *Id.* Indeed, "the

procedures that [FERC] allege[s] govern[ its] penalty assessment . . . ar[i]se from FERC's own

policies, and are not derived from the express language of the statute." *Silkman*, 233 F. Supp. 3d

at 219.

In contrast, if the party elects the Default Option, he or she is then entitled to a full

adversarial hearing before an ALJ. *See* 16 U.S.C. § 823b(d)(2)(A) (stating that, under the

Default Option, "the Commission shall assess the penalty, by order, after a determination of

violation has been made on the record after an opportunity for an agency hearing pursuant to [the

---

[26] Given the process by which an investigation occurs, the vast majority of what FERC contends comprises the "administrative record" in this case was compiled *before* Respondents elected proceedings under the Default Option. (*See* FERC Notice of Filing Administrative R.3, ECF No. 37 ("[T]he Administrative Record being filed today consists of the materials filed by the Commission's Enforcement litigation staff and by Respondents in the Show Cause Proceeding as well as the Commission's orders issued in that proceeding.")); (*see also* Index of Administrative R. 4, ECF No. 37-1 (identifying the May 29, 2015 Order Assessing Civil Penalties, the June 1, 2015 "Filing by Eric S. Morris Requesting Clarification," and the October 26, 2015 Order Denying Clarification as parts of the "administrative record").)

Here, the "administrative record" that FERC proffers also is comprised of *three years* of investigation conducted before Respondents had either notice that they were under investigation or the opportunity to provide any arguments or information countering the investigation. (*See* FERC Br. 10 ("In August 2010, the Commission . . . launched what would become a multi-year investigation[, and] in August 2013, . . . . sent Respondents lengthy letters detailing Enforcement's preliminary conclusion that Respondents had committed fraud [and] . . . . invit[ing] Respondents to provide argument or evidence suggesting the preliminary conclusion was incorrect, which they did in October 2013.").)

[27] By contrast, the Commission does not act as a fiduciary to the investigated party in the way that an administrator under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, serves when investigating and creating an administrative record in an ERISA action. *See Barclays Bank*, 247 F. Supp. 3d at 1133–35.

Administrative Procedures Act] before an administrative law judge"). Should a party wish to appeal an order assessing penalties under the Default Option, the administrative record will consist of "[t]he transcript of testimony and exhibits, together with all papers and requests filed in the [formal hearing before the ALJ]." 5 U.S.C. § 556(e). Any such evidence included in the administrative record will have been subjected to exclusion on the grounds that it was "irrelevant, immaterial, or unduly repetitious." 5 U.S.C. § 556(d).

Thus, not only does the Default Option provide no definition for what constitutes the "administrative record" that FERC contends governs this Court's "de novo review of the law and the facts involved," but the definition FERC offers makes little sense when considering the statutory scheme as a whole. *See Barclays Bank*, 247 F. Supp. 3d at 1128 ("Congress plainly knows what an administrative record is, and how to limit court review to that record. . . . [but] Congress in this statute has not expressly limited this Court's review to any 'administrative record.'") (footnote omitted) (citing 16 U.S.C. § 839f(e)(2); 42 U.S.C. § 405(g); 42 U.S.C. § 9613(j)(1)). FERC argues that "Respondents had numerous opportunities to make their case during the proceeding below. . . . [the Default Option Procedures] do not require this Court to ignore the proceedings before the Commission, and Respondents can point to no irregularity to justify devoting judicial resources to a protracted 'do-over.'" (FERC Br. 7.)

But if a party elects the Default Option, that party is entitled to the additional process and procedure involved in a formal administrative hearing before an ALJ. *See* 16 U.S.C. § 823b(d)(2)(A). The Default Option thus "provides for full proceedings after the 'administrative record' has been compiled." In contrast, the Alternate Option, according to FERC, would involve—at best—a presumption against an opportunity to be heard that must be

overcome. FERC "offers no explanation for why a 'do over' is warranted with the [Default Option] route but not with the [Alternate Route]." *Barclays Bank*, 247 F. Supp. 3d at 1126.

### iii.    Potential for Due Process Violations

Not only does FERC's assertion that this Court's review is limited to the so-called (but statutorily undefined and unaddressed) "administrative record" find little basis in the statute or common sense, but it has the potential for creating due process violations.

"The fundamental requirement of due process is the opportunity to be heard *at a meaningful time and in a meaningful manner*." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added) (internal quotations omitted). The basic due process requirement of a "'fair trial in a fair tribunal' . . . applies to administrative agencies . . . as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975) (quoting *In re Murchson*, 349 U.S. 133, 136 (1955) and citing *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973)). Waiver of a constitutional right ordinarily requires "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). And courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights" and will "not presume acquiescence in the loss of fundamental rights." *Id.* (internal quotation marks and citations omitted).

FERC argues that Respondents had sufficient opportunity to present their case in the proceedings below, and are not entitled to "a protracted do-over" in this Court.

> Respondents briefed their arguments extensively, making many of the same arguments they have made . . . before this Court. In these briefs, Respondents had a full and fair opportunity to—and did—present evidence and argument in their defense, including as many statements, affidavits, documents, data, information, or other submissions as they wished. . . . Because the Commission places no page limits on a party's briefs, and submissions are not subject to any evidentiary rules, Respondents had unfettered flexibility and discretion in choosing how to present argument and evidence to the Commission.

(FERC Br. 6.)

Respondents, on the other hand, contend that "much of the 'process' to which FERC apparently refers was part of the enforcement staff's investigation." (Resps.' Br. 19.) And although Respondents may have submitted argument and evidence—and even substantial amounts of both—they "had no right during FERC's investigation to take discovery on any aspect of the case against them or to test that case before an impartial fact-finder." (*Id.*) Moreover, "[t]he materials in the so-called administrative record were never tested under any evidentiary standard—and may not be admissible under the Federal Rules of Evidence." (*Id.*)

It is true that Respondents had the opportunity to—and did—submit legal arguments and statements in response to the Commission's investigations. FERC, moreover, has included many, if not all, of the Respondents' submissions in the so-called "administrative record" it filed with the Court. (*See* Not. Filing Admin. R.) The sheer volume of the discovery in this case, however, does not conclusively establish that Respondents were granted sufficient process in the administrative proceedings to date.

Although "subjects of an investigation are always free to contact Enforcement staff to provide additional information or explanations of their conduct," 123 FERC 61,156 P 28, subjects of an investigation are "forced to rely upon Enforcement's investigation, and whatever evidence they [can] obtain on their own from volunteers," *Barclays*, 247 F. Supp. 3d at 1129. Respondents have had, to date, no opportunity to compel any witnesses or documents or to cross-examine any of the Commission's witnesses. Neither have they been able to test the reliability or veracity of the Commission's evidence through the evidentiary standards of either the Federal Rules of Evidence or the APA's requirement that "irrelevant, immaterial, or unduly repetitious evidence" be excluded in formal hearings, 5 U.S.C. § 556(d).

"[T]here is a fundamental difference between forcing a party to rely on and develop its

defenses based entirely on the discovery taken by its opponent and allowing that party to engage

in its own independent discovery in support of its own defenses." *Barclays Bank*, 247 F. Supp.

3d at 1129 (quotations omitted). Respondents have not yet had the opportunity to engage in their

own independent discovery which, if denied without a knowing and intelligent waiver by

Respondents, could implicate their due process right to be heard "in a meaningful manner." *See*

*Mathews*, 424 U.S. at 333. Many of the cases assessing the procedures required under the

Alternate Option found that, absent applicability of the Federal Rules of Civil Procedure in

district court, this scheme could lead to fundamental fairness concerns. *See Barclays Bank*, 247

F. Supp. 3d at 1136; *Silkman*, 233 F. Supp. 3d at 225–27; *Maxim Power*, 196 F. Supp. 3d at

190–91. This Court agrees. FERC's contention that the knowing waiver of a full adversarial

hearing in order to obtain a more favorable standard of review in district court does not

overcome the serious procedural deficiencies their proffered interpretation engenders.[28]

---

[28] In order to determine whether existing procedures comport with due process, a reviewing court must weigh "the private interest that will be affected by the official action . . . , the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" against "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Here, Respondents' private interest is strong, with Powhatan facing a $16,800,000 fine, CU Fund facing a $10,080,000 fine, Chen facing a $1,000,000 fine, and HEEP facing a $1,920,000 fine. (*See* Penalty O. at 2.) The risk of an erroneous deprivation in these circumstances is also great, if only because "the simple fact that the Commissioners perform both investigatory and adjudicatory functions in the same case risks an inherent bias in the decisionmaking process." *Maxim Power*, 196 F. Supp. 3d at 195. The probable value of adversarial procedures is high, in part because Respondents will, for the first time, be able to utilize compulsory process in their defense. Finally, although the Commission's interest in quick and efficient imposition of penalties is strong, "that interest does not equate to denying Respondents process which they would have had if [the Default Option] had been elected. . . . An adversarial process in general does not impose an excessive burden on FERC, as evidenced by the use of adversarial proceedings under [the Default Option]." *Id.* at 196. In sum, denying

The Court need not determine whether the statute, if interpreted as FERC proposes in this litigation, would violate Respondents' due process rights because the interpretation of the statute FERC currently advocates does not withstand review.[29] The statute provides that, under the Alternate Option, Respondents are entitled to a trial *de novo* in the district court in which the Federal Rules of Civil Procedure and the Federal Rules of Evidence will apply. This procedure obviates any due process concerns. *Cf. Silkman*, 233 F. Supp. 3d at 226 ("Ultimately, however,

---

the Respondents access to a truly adversarial proceeding, including the use of compulsory process and the ability to subpoena information and witnesses, would likely violate due process.

[29] The Court recognizes that, usually, a court should give an agency's interpretation of its governing statutes substantial deference. When Congress expressly delegates its interpretive authority to an agency, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)). Absent such express delegation and ensuing regulation, however, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances." *Id.* at 228. Courts look to several factors to determine the extent of deference due an agency's interpretation, including "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Id.* Accordingly, even an agency's litigation position could be entitled to substantial deference.

The Court finds, however, that the statutory interpretation FERC advocates in this litigation does not withstand even a deferential review. First, by saying that *some* discovery may be allowed (without saying why or how), FERC acknowledges the tension in the position it takes before this Court. Second, in one other district court action, FERC proceeded without challenge as if the Federal Rules of Civil Procedure *did* apply in the Alternate Option. *See Fed. Energy Regulatory Comm'n v. MacDonald*, 862 F. Supp. 667 (1994); *see also Maxim Power*, 196 F. Supp. 3d at 193. Thus, before at least one Court, the Commission has proceeded under Respondents' preferred terms. Finally, as noted above, the legislative history of the AEA and NGPA as well as earlier—albeit dated—Commission statements indicate, at the very least, agency confusion about the proper process this Court should undertake.

> While FERC's views of the issue may provide guidance as to the appropriate construction of the statute, it is not the task before the Court to evaluate the accuracy or consistency of FERC's interpretation of this Court's authority under 16 U.S.C. § 823b(d)(3); rather, it is the Court's duty to determine what this Court's authority actually is under the law.

*Silkman*, 233 F. Supp. 3d at 222.

this Court need not decide whether the procedures that FERC employed in this case violated the Respondents' due process rights because the Court may use its own discretion, based on a variety of factors, to determine whether to expand the scope of its de novo review.").

### C.     <u>The Court Need Not Look Beyond the Language of the Statute</u>

Because the Court finds that the terms of the statute in the Alternate Option are unambiguous on their face, considering the statute as a whole, it need not look beyond the plain language of the statute to determine the procedures that will apply in this case. *See, e.g.*, *Morison*, 844 F.2d at 1064 ("If the terms of this statute are unambiguous on their face, or in light of ordinary principles of statutory interpretation, then 'judicial inquiry is complete.'") (internal citation and quotation marks omitted). The Court, like others to have examined this issue, "thinks it more natural to assume that both Options allow defendants to fully develop their factual defenses, just in different settings." *City Power*, 199 F. Supp. 3d at 232. The contextual reading of the statute at bar has the concomitant salutary effect of maintaining constitutional due process norms.

### III.  Conclusion

For the foregoing reasons, the Court concludes that the Respondents are entitled to a *de novo* trial governed by the Federal Rules of Civil Procedure and Federal Rules of Evidence. The Court declines to determine at this time whether Respondents are entitled to trial by jury.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: 12/28/17
Richmond, Virginia