# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**FEDERAL ENERGY REGULATORY COMMISSION,**

        **Petitioner,**

v.

                                        **Civil Action No. 3:15cv452**

**POWHATAN ENERGY FUND,**
**LLC, *et al.*,**

        **Respondents.**

## MEMORANDUM OPINION

This matter comes before the Court on the Joint Motion to Dismiss (the "Motion to Dismiss") filed by Respondents Powhatan Energy Fund, LLC ("Powhatan"), Houlian "Alan" Chen ("Chen"), HEEP Fund, Inc. ("HEEP Fund"), and CU Fund, Inc. ("CU Fund") (collectively, "Respondents"). (ECF No. 95.) Respondents contend that the Federal Energy Regulatory Commission ("FERC" or the "Commission") brought this action beyond the applicable statute of limitations, that FERC does not have the authority to seek disgorgement as a civil penalty, and, assuming disgorgement is available, that it is also barred by the statute of limitations. (Mem. Supp. Mot. Dismiss 1, ECF No. 96.) FERC opposed the Motion to Dismiss, and Respondents replied. (ECF Nos. 99, 106.) Accordingly, the matter is ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 16 U.S.C. § 823b(d)(3)(B)[1] and 28 U.S.C. § 1331.[2] For the reasons that follow, the Court will deny the Motion to Dismiss.

## I. Factual and Procedural Background

An earlier decision by this Court concluded that its *de novo* review of FERC's imposition of penalties required application of the Federal Rules of Civil Procedure and the Federal Rules of Evidence. *Fed. Energy Regulatory Comm'n v. Powhatan Energy Fund, LLC* ("*FERC I*"), 286 F. Supp.3d 751 (E.D. Va. 2017). *FERC I* contains a detailed explanation of the two administrative procedures available in 16 U.S.C. § 823b: the typical administrative process, which this Court has dubbed the "Default Option," and the uncommon administrative scheme, which this Court has called the "Alternate Option," at issue here. The determination below presumes familiarity with *FERC I*.

---

[1] Section 823b(d)(3)(B) provides that, if an assessed civil penalty is not paid within sixty calendar days,

> the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty. The court shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art, such assessment.

16 U.S.C. § 823b(d)(3)(B) (footnote omitted).

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

## A.    **Factual Background**[3]

Respondents consist of Chen and various financial entities on whose behalf Chen traded

energy for the approximately two months at issue in this case, between June 1, 2010, and August

3, 2010 (the "Two-Month Alleged Manipulation Period"). Chen owns the entirety of

Respondents HEEP Fund and CU Fund. Respondents conducted financial trades through the

wholesale electricity market administered by PJM Interconnection, LLC ("PJM"), an

organization that operates various electricity markets throughout the Mid-Atlantic. Certain

energy trades qualified market participants to receive a payment, known as a "Marginal Loss

Surplus Allocation," or MLSA, which PJM distributed to customers making certain trades. (Am.

Compl. Ex. 1 ("Penalty Order") ¶ 2, ECF No. 93-1.) FERC alleges here that, during the Two-

Month Alleged Manipulation Period, Respondents "designed and implemented a fraudulent . . .

trading scheme to receive excessive amounts of MLSA payments," by manipulating "day-ahead"

and "real-time" energy trades to engage in wash trades: "trades that are pre-arranged to cancel

each other out and involve no economic risk." (*Id.* ¶¶ 3, 6.)

FERC became aware of Respondents' purportedly manipulative activities after PJM

received two complaints from a market participant about someone "trying to game the system."

(*Id.* ¶ 26.) In August 2010, in response to these complaints, PJM submitted a "referral" to the

Commission's Office of Enforcement ("Enforcement"), alerting the Commission to

Respondents' allegedly fraudulent behavior and setting off the investigations that ultimately

---

[3] Because Respondents' Motion to Dismiss argues that FERC brought this action outside
of the statute of limitations, the facts underlying Respondents' two months of allegedly
manipulative trading have little relevance. As background, the Court offers a brief description of
the underlying facts of Respondents' allegedly manipulative trading.

resulted in this action.[4]  (*Id.*)  That same month, Enforcement began investigating Respondents. On August 25, 2010, the Commission issued an order formalizing the investigation.  The investigation, while formal, was not adversarial.  *See* 18 C.F.R. § 1b.13.  Under applicable regulations, the investigation became formal because FERC issued an Order of Investigation.[5]  On August 9, 2013, after nearly three years of formal investigation, Enforcement staff issued letters of preliminary findings to Respondents "explaining the factual and legal bases for its preliminary findings of violations."  (*Id.* ¶ 30.)  Respondents replied to the letters on October 9, 2013.

On August 5, 2014, almost one year later, four years after the Commission began investigating Respondents, and more than four years after the Two-Month Alleged Manipulation Period, the Office of the Secretary issued a Notice of Alleged Violations.  Settlement discussions failed, and Enforcement issued Respondents a notice of its "intent to recommend the initiation of a public proceeding against Respondents" (the "Notice").  Respondents replied to the Notice on September 24, 2014.  The Notice and Respondents' opportunity to reply constituted the first

---

[4] PJM conducted its own investigation, which took approximately four months.  On January 6, 2011, PJM's Independent Market Monitor submitted an additional referral to Enforcement.  PJM's Independent Market Monitor compared Respondent's actions to wash trades and to Enron's manipulative trading.

[5] *See Enforcement of Statutes, Regulations[,] and Orders*, 123 FERC ¶ 61,156 ¶ 23 n.18 (2008) (Revised Policy Statement), https://ferc.gov/whats-new/comm-meet/2008/051508/M-1.pdf?crst=14524249164196914404 (citing 18 C.F.R. §§ 1b.3, 1b.5, 1b.6, and 375.314 and stating that "[a]ccording to these regulations, staff can conduct a preliminary investigation or, if compulsory process is required, seek an order from the Commission commencing a formal investigation.  Except for the subpoena authority available to staff in a formal investigation, preliminary and formal investigations are handled in the same manner.") (internal citation omitted).)
No statute or regulation *requires* the Commission to conduct a formal—rather than informal—investigation.  *See* 18 C.F.R. § 1b.5 ("The Commission *may, in its discretion*, initiate a formal investigation by issuing an Order of Investigation." (emphasis added)).

procedural requirement with which the Commission had to comply in the investigation and penalty assessment process.[6] Respondents submitted their response, and almost two months later, on December 17, 2014—four years and four months after the end of the Two-Month Alleged Manipulation Period—the Commission issued an Order to Show Cause.[7] The OSC constituted the second procedural requirement—and the first process compelled by statute—with which the Commission had to comply.[8] *See* 16 U.S.C. § 823b(a) ("After *notice* and an opportunity for public hearing, the Commission may issue such orders as necessary to require compliance . . . ." (emphasis added)).

---

[6] The Notice was mandated by regulation, but not by statute. *See* 18 C.F.R. § 1b.19 (stating that the Enforcement staff investigating a violation "*shall*, unless extraordinary circumstances [exist] . . . notify the entity [under investigation] that the Investigating Officer intends" to recommend the initiation of a penalty assessment process, "provide sufficient information and facts to enable the entity to provide a response," and "present [any response timely submitted] to the Commission together with the Investigating Officer's recommendation." (emphasis added).)

[7] The next day, the Commission issued an Order Revising Show Cause Order. (*See* Am. Compl. Ex. 2 ("OSC"), ECF No. 93-2.) The initial Order to Show Cause had notified Respondents only that the Commission intended to impose civil penalties. (*See* OSC 1–2.) The Order Revising Show Cause Order clarified that the Commission contemplated imposing disgorgement of profits *and* civil penalties. (Revised OSC 1.) The Court will refer to the Order Revising Show Cause Order, the Order to Show Cause and Notice of Proposed Penalty, and the Enforcement Staff Report and Recommendation attached to the OSC collectively as the "OSC."

[8] A regulation governs the contents of the required notice. Under 18 C.F.R. § 385.1506(b),

The notice of proposed penalty will:
    (1)   Include the amount of the proposed penalty;
    (2)   Include a statement of the material facts constituting the alleged violation; and[,]
    (3)[] Inform the person of the opportunity to elect in writing within 30 days of receipt of the notice to have the procedures of [the Alternate Option] (in lieu of those of [the Default Option]) apply with respect to the assessment . . . .

18 C.F.R. § 385.1506(b).

The OSC alleged Respondents violated the statute and regulation forbidding the use of manipulative behaviors in connection with the purchase or sale of electric energy:[9] 16 U.S.C. § 824v(a)[10] and 18 C.F.R. § 1c.2,[11] respectively. The OSC recommended that the Commission assess penalties and profit disgorgement against each of the Respondents in the following amounts:

| | |
|---|---|
| CU Fund: | $10,080,000 civil penalty; $1,080,576 disgorgement; |
| HEEP Fund: | $1,920,000 civil penalty; $173,100 disgorgement; |
| Powhatan: | $16,800,000 civil penalty; $3,465,108 disgorgement; and, |
| Chen: | $1,000,000 civil penalty. |

(OSC 1, ECF No. 93-2.) The OSC also recommended that: (1) HEEP Fund, CU Fund, and

Chen be jointly and severally liable for disgorgement of unjust profits; (2) HEEP Fund,

Powhatan, and Chen be jointly and severally liable for disgorgement of unjust profits; (3) HEEP

_____

[9] Congress passed Section 824v as part of the Energy Policy Act of 2005, Pub L. No. 109-58, 119 Stat. 594 (2005), codified in part at 16 U.S.C. §§ 824v, 825o-1, in response to the "Western Energy Crisis" of 2000 to 2001. *See* Fed. Energy Regulatory Comm'n, *Addressing the 2000–2001 Western Energy Crisis*, http://www.ferc.gov/industries/electric/indus-act/wec.asp (last visited Jan. 4, 2016). Congress modeled Section 824v (also known as Section 222 of the FPA) on Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. *See* 16 U.S.C. § 824v(a) (forbidding the use of "any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of Title 15)").

[10] 16 U.S.C. § 824v(a), as relevant, prohibits the direct or indirect use of manipulative or deceptive devices "in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission." 16 U.S.C. § 824v(a).

[11] 18 C.F.R. § 1c.2(a) prohibits entities, in connection with the purchase or sale of energy or transmission services subject to the Commission's jurisdiction, from: (1) "us[ing] or employ[ing] any device, scheme, or artifice to defraud;" (2) making untrue or misleading statements of material fact, or omitting facts in a way that is untrue or misleading; and, (3) engaging "in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity." 18 C.F.R. § 1c.2(a).

Fund and Powhatan be jointly and severally liable for the penalties against HEEP Fund; and, (4) HEEP Fund and Powhatan be jointly and severally liable for the penalties against Powhatan.

The OSC directed Respondents to show cause within thirty days why they should not be found to have engaged in manipulative trading and required to disgorge profits and be assessed the proposed civil penalties. The OSC also ordered Respondents to elect either a formal hearing before an administrative law judge ("ALJ") prior to the assessment of a penalty, pursuant to 16 U.S.C. § 823b(d)(2), (the "Default Option"), or to proceed under 16 U.S.C. § 823b(d)(3)(A), (the "Alternate Option"), under which the Commission would "promptly" assess penalties upon a finding of violation.[12] Finally, the OSC allowed Enforcement thirty days after Respondents filed their answer to file a reply with the Commission.[13]

The Commission extended Respondents' deadline to respond once, on December 31, 2014, granting Respondents until February 2, 2015, to respond to the OSC.[14] On January 12, 2015, before submitting their response, Respondents submitted a joint notice of their election to proceed in accordance with the Alternate Option, "thereby electing an immediate penalty assessment if the Commission [found] a violation." (Penalty Order ¶ 33.)

---

[12] When a respondent has elected to proceed without a full agency hearing pursuant to the Alternate Option, "the Commission shall promptly assess such penalty, by order, after the date of the receipt of the notice . . . of the proposed penalty." 16 U.S.C. § 823b(d)(3)(A); *see id.* § 823b(d)(1) (allowing respondent to proceed under 16 U.S.C. § 823b(d)(2) with an agency hearing before an administrative judge or elect to advance under 16 U.S.C. § 823b(d)(3) without such a hearing).

[13] Nothing in the record or the parties' briefing indicates that Enforcement had any statutory or regulatory entitlement to reply to Respondents' response.

[14] The Court finds no authority indicating that statutes or regulations required the Commission to grant this extension. Indeed, the Commission *denied* Respondents' second request for an extension, instead granting Respondents the opportunity to "file supplemental answers by February 9, 2015." (Penalty Order ¶ 32 n.65.)

After cross-briefing[15] and a review of the extensive record, the Commission issued its eighty-nine-page Order Assessing Civil Penalties (the "Penalty Order") on May 29, 2015—just over five months after issuing the OSC, and almost five years after the Two-Month Alleged Manipulation Period. In the Penalty Order, the Commission found that Respondents had "violated section 222 of the [FPA] and section 1c.2 of the Commission's regulations, which prohibit energy market manipulation, through a scheme to engage in fraudulent Up-To Congestion (UTC) transactions in [PJM's] energy markets to garner excessive amounts of certain credit payments to transmission customers." (*Id.* ¶ 1.) The Commission also determined that Respondents "engaged in round-trip UTC transactions not for hedging or arbitraging price spreads but instead to receive large shares of MLSA payments that otherwise would have been allocated to other market participants." (*Id.* ¶ 69.) The Commission ruled that "Respondents' round-trip UTC trades [were] wash trades, and therefore *per se* fraudulent and manipulative." (*Id.* ¶ 103.) Citing the Commission's Market Behavior Rules, the Commission stated that wash trades possess "two key elements[.] . . . [T]he transactions: (1) are pre-arranged to cancel each other out; and[,] (2) involve no economic risk." (*Id.*)

---

[15] On February 2 and February 9, 2015, Respondents provided their answers to the OSC. On March 2, 2015, Enforcement staff replied to Respondents' answers, and Respondents submitted various additional responses on March 18, 2015, April 14, 2015, and April 23, 2015. Because the March 18, 2015, April 14, 2015, and April 23, 2015 filings were not permitted, the Commission did not consider them in its ruling.

Because of its findings, and pursuant to 16 U.S.C. § 823b(c),[16] the Commission assessed

penalties and profit disgorgement in the same amounts as those recommended in the OSC:

> CU Fund: $10,080,000 civil penalty; $1,080,576 disgorgement;
>
> HEEP Fund: $1,920,000 civil penalty; $173,100 disgorgement; and,
>
> Powhatan: $16,800,000 civil penalty; $3,465,108 disgorgement;
>
> Chen: $1,000,000 civil penalty.

(Penalty Order ¶¶ 164, 174, 187, 190.) The Commission also agreed with the OSC

recommendations regarding joint and several liability, and therefore held: (1) HEEP Fund, CU

Fund, and Chen jointly and severally liable for disgorgement of unjust profits; (2) HEEP Fund,

Powhatan, and Chen jointly and severally liable for disgorgement of unjust profits; (3) HEEP

Fund and Powhatan jointly and severally liable for the penalties against HEEP Fund; and,

(4) HEEP Fund and Powhatan jointly and severally liable for the penalties against Powhatan.

The Commission ordered the payment of all penalties and profit disgorgement within

sixty days, and directed PJM to "establish a method to resettle and distribute the resettled MLSA

Payments . . . . [and] to provide reimbursement of MLSA payments . . . to those entities

identified as a result of PJM's proposed methodology." (*Id.* at 88.) Respondents failed to pay

---

[16] 16 U.S.C. § 823b(c) states, in pertinent part:

(c) Civil penalty

Any licensee, permittee, or exemptee who violates or fails or refuses to comply with any rule or regulation under this subchapter, any term, or condition of a license, permit, or exemption under this subchapter, or any order issued under subsection (a) [of this section] shall be subject to a civil penalty in an amount not to exceed $10,000 for each day that such violation or failure or refusal continues. Such penalty shall be assessed by the Commission after notice and opportunity for public hearing.

16 U.S.C. § 823b(c).

the penalties within 60 days, and, pursuant to § 823b(d)(3)(B),[17] the Commission filed the action

in this Court on July 31, 2015—two months after the Commission issued its Penalty Order,

seven months after the Commission issued the OSC, and almost five years after the Two-Month

Alleged Manipulation Period.

### B.    Procedural Background

On July 31, 2015, FERC filed this action seeking an order affirming and enforcing the

Commission's Penalty Order. (ECF No. 1.)  Respondents filed motions to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6).[18]  (ECF Nos. 20, 22.)  Neither party adequately

addressed what procedures the Court must follow in conducting the "review de novo [of] the law

and the facts involved" required by § 823b(d)(3)(B), under which this action proceeds.  (*See* ECF

Nos. 20, 22, 28, 29, 33, 34.)  The Court ordered the parties to address this threshold matter and

submit briefing "detailing the respective party's position regarding the procedure mandated by

16 U.S.C. § 823b(d)(3)(B)."  (ECF No. 36.)

After the parties submitted cross-briefs discussing the meaning of this Court's *de novo*

review procedure under § 823b(d)(3)(B), the Court denied the initial motions to dismiss without

prejudice and ordered additional briefing.  (ECF No. 44.)  The parties then filed supplemental

briefs, and a great deal of supplemental authority.  (ECF Nos. 52, 53, 55, 68, 69, 70, 78, 79, 80,

82, 83, 84, 85, 88-1.)  On December 28, 2017, the Court issued *FERC I*, ruling that Respondents

were entitled to a trial *de novo* governed by the Federal Rules of Civil Procedure and the Federal

---

[17] 16 U.S.C. § 823b(d)(3)(B) states in part: "(B) If the civil penalty has not been paid within 60 calendar days after the assessment order has been made under subparagraph (A), the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty." 16 U.S.C. § 823b(d)(3)(B).

[18] Federal Rule of Civil Procedure 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Rules of Evidence. (ECF Nos. 89, 92.) The Court ordered FERC to file an Amended Complaint, and set a schedule by which Respondents should file their responsive pleadings to the Amended Complaint. (ECF No. 92.) Respondents timely filed their Motion to Dismiss. (ECF No. 95.)

## II. Analysis

As with the Court's determination on the meaning of the *de novo* review procedure under 16 U.S.C. § 823b(d)(3)(B) in *FERC I*, the Motion to Dismiss presents an issue of first impression in this District, and one which neither the Supreme Court of the United States nor the United States Court of Appeals for the Fourth Circuit has addressed.[19] Respondents argue in the Motion to Dismiss that FERC's claim in this Court accrued at the time of the alleged violations (the Two-Month Alleged Manipulation Period), the vast majority of which occurred outside the statute of limitations. Respondents further assert that no statutory basis exists for the Commission's ordered disgorgement of profits or for this Court to enforce the order of disgorgement, and, even if one did exist, the statute of limitations also bars this Court from enforcing most of the ordered disgorgement.

FERC disagrees with each of Respondents' arguments. Pertinent here, FERC asserts that its claim in this Court accrued, for statute of limitations purposes, only when Respondents failed to pay the penalty within sixty days of the Commission assessing it via the Penalty Order. FERC

---

[19] The Court also sees no directly on-point decisions from any other United States Courts of Appeal. The parties have identified none. Instead, each of the parties relies on decisions addressing analogous issues, which the Court will address later in this opinion.

To date, two federal district courts have decided the issue at bar, reaching opposite conclusions. *Compare Fed. Energy Regulatory Comm'n v. Barclays Bank PLC*, No. 2:13cv02093, 2017 WL 4340258, at *15 (E.D. Cal. Sept. 29, 2017) (holding that the statute of limitations for a district court action brought pursuant to the Default Option runs from the time of the underlying violation); *with Fed. Energy Regulatory Comm'n v. Silkman*, 177 F. Supp. 3d 683, 700–01 (D. Mass. 2016) (holding that a suit under the Default Option for the enforcement of a civil penalty assessment accrues sixty days after the alleged violators failed to pay the assessed penalty).

also argues that the Commission's ordered disgorgement is remedial and not subject to any statute of limitations, and the Court may order disgorgement under its inherent equitable powers.

No clear answer exists for any of these issues, but the outcome materially impacts the parties' rights and responsibilities. If FERC prevails, all penalties remain timely and Respondents could be liable for more than $28 million dollars in civil penalties and more than $4 million dollars in disgorgement. On the other hand, if Respondents present the correct interpretation, FERC cannot maintain a suit for enforcement of the penalty assessment order as to the vast majority of the dates within the Two-Month Alleged Manipulation Period, substantially reducing the monetary value of this action.

The atypical statutory scheme for assessing a penalty under the Alternate Option of § 823b has generated prolonged litigation before this Court and other courts addressing FERC's attempts to assess and enforce assessed penalties pursuant to that statute. Statutes, more commonly, presume enforcement after a formal agency adjudicative process pursuant to the Administrative Procedures Act ("APA"). *See, e.g.*, *Fed. Energy Regulatory Comm'n v. City Power Mktg, LLC*, 199 F. Supp. 3d 218, 230 (D.D.C. 2016) (noting that the "traditional form of judicial review of agency action[ is] based on the record developed in an agency proceeding."). In the alternative, some statues provide for immediate adversarial action in a federal court, thereby bypassing full agency review. *See, e.g.,* 42 U.S.C. § 2000e-5 (allowing for district court jurisdiction if the Equal Employment Opportunity Commission cannot reach a satisfactory conciliation agreement with the offending employer within thirty days after a Title VII charge is filed). Because the Alternate Option does neither, a catch-all statute of limitations applicable to all actions (and which seemingly presumes more common procedures) does not jibe well with the principles of statutory interpretation that must govern this Court's analysis.

However, considering the plain language of the relevant statute of limitations in the context of the process by which FERC assesses civil penalties, and mindful of the long-established principle that courts may not interpret statutes contrary to the plain language, the Court finds that the action currently before it accrued sixty days after Respondents failed to pay the Penalty Assessment Order. FERC's action in this Court therefore falls well within the five-year statute of limitations.

Further, given the fact-intensive nature of determining whether disgorgement constitutes a penalty, the Court cannot determine on the record before it whether the ordered disgorgement operates as a penalty falling within the language of the statute of limitations. Regardless, the Commission had the authority to order disgorgement, and this Court has the inherent equitable power to affirm or modify that order as to the disgorgement. Given the Court's finding that FERC commenced this action within five years of the date on which it accrued, the action seeking affirmance of the order of disgorgement would be timely even if the disgorgement did amount to a penalty. The Court will therefore deny Respondents' Motion to Dismiss.

A.    **Relevant Legal Standards**

1.    **Federal Rule of Civil Procedure 12(b)(6)**

Although the Motion to Dismiss presents a pure question of law for the Court, the Court remains mindful of, and will apply, the familiar standard for ruling on a motion to dismiss for failure to state a claim. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-

pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions," but instead must assert facts that rise above speculation and conceivability to those that "show" a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 570; Fed. R. Civ. P. 8(a)(2)).

### 2. Fundamental Principles of Statutory Interpretation

The Court must employ traditional principles of statutory interpretation to construe the governing statute of limitations. The purpose of statutory interpretation is "to try to determine congressional intent." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990). The analysis must "begin, as always, with the language of the statutory text," and "[i]n the absence of a definition from Congress, [the Court] accord[s] words in a statute their ordinary, contemporary, common meaning." *United States v. Midgett*, 198 F.3d 143, 145–46 (4th Cir. 1999) (internal citation and quotation marks omitted); *see also Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 388 (1993) ("Courts properly assume, absent sufficient indication to the

14

contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))).

The Court must look to the statute as a whole in determining the meaning of individual words because "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *see also Dole*, 494 U.S. at 35 ("[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal citation and quotation marks omitted). And courts should read statutes, "where possible[,] as effecting a 'symmetrical and coherent regulatory scheme.'" *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 99 (2006) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Furthermore, when interpreting the application of a statute of limitations, courts must read the statute of limitation's language "'in the light of the general purposes of the statute [to which the statute of limitations applies] and of its other provisions, and with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought.'" *Crown Coat Front Co. v. United States*, 386 U.S. 503, 517 (1967) (quoting *Reading Co. v. Koons*, 271 U.S. 58, 62 (1926)).

When "the terms of [a] statute are unambiguous on their face, or in light of ordinary principles of statutory interpretation," judicial inquiry normally ends. *United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988). But if the "terms of a statutory provision are ambiguous [the Court may] . . . consider other evidence to interpret the meaning of the provision, including the legislative history and the provision's heading or title." *United States v. Hatcher*, 560 F.3d

222, 226 (4th Cir. 2009) (citing *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)). At base,

> [i]f the language is ambiguous, in that it lends itself to more than one reasonable interpretation, [the court's] obligation is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested.

*United States v. Joshua*, 607 F.3d 379, 384 (4th Cir. 2010). Finally, a court is "not at liberty to rewrite [a] statute to reflect a meaning [it] deem[s] more desirable. Instead, [courts] must give effect to the text Congress enacted." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008).

## B.     Section 2462 Serves as the Governing Statute of Limitations

No party contests, nor could they, that § 823b lacks an independent statute of limitations, meaning that the general, catch-all statute of limitations for civil fines and penalties applies here. *See 3M Co. v. Browner*, 17 F.3d 1453, 1455 (D.C. Cir. 1994) (stating that § 2462 is the "statute of limitations . . . generally applicable to civil fines and penalties"). Section 2462 provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.[20] Section 2462 is not specific to the FPA.[21] Rather, as the so-called "catch-all" statute of limitations, it "governs many penalty provisions throughout the U[nited] S[tates] Code." *Gabelli v. SEC*, 568 U.S. 442, 445 (2013).

---

[20] The origins of § 2462 "date back to at least 1839, and it took on its current form in 1948." *Gabelli*, 568 U.S. at 445. From 1839 until 1874, the predecessor to § 2462 provided, in relevant part, that "no suit or prosecution shall be maintained, for any penalty or forfeiture, pecuniary or otherwise, accruing under the laws of the United States, unless the same suit or prosecution shall be commenced within five years from when the penalty or forfeiture accrued." *3M*, 17 F.3d at 1458 n.7 (quoting Act of Feb. 28, 1839, ch. 36, § 4, 5 Stat. 321, 322). In 1874, Congress replaced that statute with one that was the same in all relevant respects. *Id.* (quoting Revised Statutes § 1047, 18 Stat. 193 (1874) (later codified at 28 U.S.C. § 791 (1911)).)

16

The Court begins "with the language of the statutory text," and gives those words undefined by Congress "their ordinary, contemporary, common meaning." *See Midgett*, 198 F.3d at 145–46 (internal citation and quotations omitted). In interpreting the statute's text, the Court does not rely on "a single sentence or member of a sentence, but look[s] to the provisions of the whole law, and to its object and policy," *Dole*, 494 U.S. at 35 (internal citation and quotation marks omitted), determining the language's meaning "by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Because it interprets the language and application of a statute of limitations, the Court remains mindful of "the hazards inherent in attempting to define *for all purposes* when a 'cause of action' first 'accrues.'" *Crown Coat*, 386 U.S. at 517 (emphasis added). The Court will follow the directive that "[s]uch words are to be 'interpreted in the light of the general purposes of the statute and of its other provisions,

---

In 1948, Congress revised much of Title 28, including 28 U.S.C. § 791—the version of § 2462 enacted in 1874. *See id.* at 1458. The Reviser's Notes to the statute's rewriting state only that "[c]hanges were made in phraseology." H.R. REP. NO. 80-308, at A191 (1947); *see also 3M*, 17 F.3d at 1458. Given § 2462's statutory history, this Court must—as other courts have—interpret the language of § 2462 consistent with the language of previous 28 U.S.C. § 791, its immediate predecessor. *See 3M Co.*, 17 F.3d at 1458 ("A long line of Supreme Court decisions compels the conclusion that the rewording did not render the new statute different in substance from the old [because w]hen the Reviser's Notes describe the alterations as changes in phraseology, the well-established canon of construction is that the revised statute means only what it meant before 1948." (collecting cases))

This dictate becomes especially important in this opinion's later discussion of disgorgement. *See infra* n.27.

[21] Because § 2462 is "generally applicable to all federal agencies," and Congress did not delegate any administrative authority to the Commission to interpret it, the Court owes no deference to FERC's reading of the statute. *Fed. Energy Regulatory Comm'n v. Barclays Bank PLC*, No. 2:13cv02093, 2017 WL 4340258, at *8 (E.D. Cal. Sept. 29, 2017) (quoting *DLS Precision Fab LLC v. United States Immigration & Customs Enf't*, 867 F.3d 1079, 1087 n.1 (9th Cir. 2017)).

and with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought.'" *Id.* (quoting *Koons*, 271 U.S. at 62).

### 1. Section 2462, More Readily Applicable to Standard Administrative Procedures, Fits Imperfectly with the Alternate Option

Because the Alternate Option apparently lacks a statutory analogue, the catch-all statute of limitations meant to apply to more common administrative procedural schemes does not fit perfectly. Several difficulties arise when trying to apply § 2462 to the statutory scheme of § 823b. First, the Alternate Option presents an administrative scheme to which neither the parties nor the Court can identify an analogue.[22] Second—and possibly because of the Alternate Option's singularity in the administrative law context—no line of cases directly addresses the question before the Court, despite the parties' attempts to assert otherwise. The Court, ultimately, faces a general statute of limitations that must be evaluated under legal precepts and

---

[22] Many compare, unpersuasively, the Alternate Option to the enforcement provision of Natural Gas Policy Act (the "NGPA"), 15 U.S.C. § 3414, saying it contains the same route to an adversarial adjudication as the Alternate Option. Section 3414(b)(6)(F) directs that if a civil penalty the Commission assessed remains unpaid "within 60 calendar days after the assessment order has been made . . . , the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty." 15 U.S.C. § 3414(b)(6)(F). In such action, as in the action before this Court, the district court "shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part, such assessment." *Id.*

But the NGPA enforcement provision differs from the FPA enforcement provision in important ways. First, the NGPA contains no equivalent of the FPA's Default Action. Rather, § 3414 provides one singular route to a penalty assessment. The Commission first "provides notice of the proposed penalty." 15 U.S.C. § 3414(b)(6)(E). Then, "[f]ollowing receipt of notice of the proposed penalty . . . , the Commission shall, by order, ass[]ess such penalty." *Id.* (footnote omitted). The NGPA thus provides only *one* route to the adversarial adjudication of a civil penalty—a "review de novo" in a federal district court. 15 U.S.C. § 3414(b)(6)(E)–(F).

Second, the NGPA enforcement provision contains its own statute of limitations. Section 3414(b)(6)(D) states that "[n]o person shall be subject to any civil penalty under this paragraph with respect to any violation occurring more than 3 years before the date on which such person is provided notice of the proposed penalty under subparagraph (E)." 15 U.S.C. § 3414(b)(6)(D). The FPA, of course, has no comparable statute of limitations. If it did, this Court could much more easily answer the question before it in the Motion to Dismiss.

principles of statutory construction more readily applied to traditional administrative processes. As such, the Court must apply the *most reasonable* interpretation that remains consistent with the statutory language.

Although aspects of all parties' positions make sense, the Court must turn to the plain language in § 823b. FERC's position conforms to the plain meaning and accepted definition of "accrue." Under the Alternate Option, FERC clearly lacks the authority to "institute an action . . . for an order affirming the assessment of the civil penalty" until two events have occurred: (1) the Commission must have assessed the penalty, by order; and (2) sixty days must have elapsed without payment of the civil penalty. Unless and until both events happen, FERC has no right to commence any action in a district court. It runs counter to the definition of "accrue" that a claim could accrue before a party has the right to initiate an action.

Respondents' position, however, seemingly comports well with the overall structure of § 823b. The Court in this action adjudicates *de novo* the propriety of the civil penalty assessment, which flows directly from the alleged violations, making it commonsensical that the claim would accrue at the time of the violation. Furthermore, this district court action under the Alternate Option functions as the equivalent of an adjudication before an ALJ under the Default Option—an action that clearly accrued at the time of the purported violations. Finally, given the lack of statutory or regulatory requirements for the Commission's penalty assessment under the Alternate Option, and the Commission's near-exclusive control over the speed with which the penalty assessment order issues, the possibility exists that the intended "prompt[]" penalty assessment might not be prompt after all.[23] Here, absent any statute or regulation dictating the

---

[23] Although the Commission issued its Penalty Assessment Order within five months of Respondents' election to have the Alternate Option apply, labeling the earlier administrative actions "prompt" seems generous. Here, the Commission conducted a nearly five-year

speed at which the penalty assessment must issue, statutes of limitations' "basic policies of . . . : repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities," *Gabelli*, 568 U.S. at 448 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)), could potentially be contravened.

Although FERC's interpretation could result in some conflict with the purposes of statutes of limitation, the reading Respondents advocate plainly conflicts with the generally accepted plain meaning of "accrue." The Court may not rewrite the statute to result in a meaning it finds more desirable. *Ali*, 552 U.S. at 228. The Court will "give effect to the text Congress enacted." *Id.* Based on the plain meaning of the word "accrue," the Court must conclude that FERC's suit for "an order affirming the assessment of the civil penalty"—the action currently pending before this Court—accrued when Respondents failed to pay the Commission's penalty assessment order within sixty days of its issuance.

### 2.    The Relevant Statutory Phrases in the Statute of Limitations

The Court must determine how 28 U.S.C. § 2462 applies to this action: it must decide what occurrence constituted the "action, suit[,] or proceeding for the enforcement of any civil fine, penalty, or forfeiture" contemplated in the statute, and when the "claim first accrued" for statute-of-limitation purposes. Respondents contend that FERC's suit in this Court is the only qualifying proceeding, meaning that FERC's claims accrued at the time of the alleged violations—the Two-Month Alleged Manipulation Period from June 1, 2010, to August 3, 2010.

---

investigation into two months of allegedly manipulative trading. During that investigation, without any APA or other procedural constraint to do otherwise, the Commission retained authority to compel the production of documents and testimony. Respondents had no equivalent right to process or discovery, or to control the pace of the investigation.

The investigation and penalty assessment process imposed few statutory or regulatory requirements or limits on the Commission. And, although promptness is not at issue in this case, no statute or regulation dictates or defines what would constitute a "prompt" penalty assessment, as the Alternate Option requires.

FERC counters that its claim for a suit in this Court first accrued when Respondents failed to pay the civil penalty within sixty days of the Commission issuing the assessment order under 16 U.S.C. § 823b(d)(3)(B)—on July 28, 2015.[24] The Court begins its analysis by examining the governing statutory phrases.

### a. "An Action, Suit, or Proceeding"

FERC plainly commenced "an action, suit[,] or proceeding" within the meaning of § 2462 by filing its Complaint in this Court.[25] Thus, FERC initiated an action within the meaning of § 2462 on July 31, 2015, when it filed its Complaint in this case. The parties properly do not dispute commencement, arguing instead about whether that action was timely, which the Court must decide.

### b. "For the Enforcement of Any Civil Fine, Penalty, or Forfeiture"

Binding precedent requires this Court to conclude that § 2462 applies to any of FERC's efforts to impose or enforce any civil fine, penalty, or forfeiture. Because, by its plain language, § 2462 governs this action to the extent FERC seeks "the enforcement of any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462. And the Fourth Circuit has held that, within the context of § 2462, "'enforcement' could be read to mean 'imposition.'" *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 669 (4th Cir. 1997) (citing and adopting the reasoning of *3M*, 17 F.3d at 1458). The

---

[24] FERC argues in the alternative that the proceedings initiated by its Order to Show Cause amounted to the "action suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture" to which § 2462 refers. Under this interpretation, because the Commission issued the Order to Show Cause well within the five-year time limit, FERC asserts that the statute of limitations has not run on its claims. Because the Court finds that FERC's cause of action in this Court accrued sixty days after Respondents failed to pay the Penalty Assessment Order, it need not address this alternative argument.

[25] Federal Rule of Civil Procedure 3 "governs the commencement of *all* actions, including those brought by or against the United States[,] or an officer or agency thereof." Fed. R. Civ. P. 3 advisory committee's notes to 1937 adoption (emphasis added). Rule 3 provides that "[a] civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3.

Fourth has Circuit reasoned that "[r]eading 'enforcement' to mean 'imposition' 'forecloses stale claims, one of the functions of a statute of limitations, since it is in the administrative proceeding that evidence is taken, findings are made and liability determined.'" *Id.* at 669–70 (quoting *3M Co.*, 17 F.3d at 1459). Accordingly, § 2462 applies to this action to the extent FERC seeks to impose "any civil fine, penalty, or forfeiture" against Respondents.

### i. The Court Has Authority to Order Disgorgement of Profits

No dispute exists that the Commission had the authority to assess *civil penalties* against Respondents, or that the Court has the authority to affirm that assessment. Respondents, however, challenge the Court's authority to order *disgorgement of profits*. Under the plain statutory language of the Alternate Option and well-established principles of federal court authority, the Court has the power to assess civil penalties and to order disgorgement of profits.

Although Respondents contend that the Commission had no authority to order disgorgement in the Penalty Order, they acknowledge that, in this federal district court action in which the Court reviews *de novo* the law and the facts involved, "judicial, not agency, authority" is implicated. (Mem. Supp. Mot. Dismiss 26.) Regarding the Court's authority to order disgorgement, Respondents argue that 16 U.S.C. § 823b

> limits the Court's jurisdiction to the civil penalty assessment. The limited scope of [§ 823b], the lack of any express statutory grant of authority for FERC to seek disgorgement in this action, and the lack of any express statutory authority even for FERC to administratively order disgorgement, together all compel the conclusion that FERC's disgorgement claims must be dismissed.

(*Id.* at 27.) Respondents' argument ignores the language of the statute and well-established principles of courts' authority.

This Court, after conducting a *de novo* review of the law and facts involved, has "jurisdiction to enter a judgment enforcing, *modifying, and enforcing as so modified, or setting*

*aside in whole or in [p]art*" the Penalty Order. 16 U.S.C. § 823b(d)(3)(B) (emphasis added) (footnote omitted). Section 823b does not limit the Court's jurisdiction in the drastic way Respondents contend. The Court may enforce the Penalty Order; modify the Penalty Order and enforce it as so modified; or set the Penalty Order aside in whole or in part.[26] Accordingly, § 823b does not divest this Court of authority it otherwise would have in any other civil action.

Courts have "inherent equitable powers . . . [and] those equitable powers assume an even broader and more flexible character" when public—rather than merely private—interests are at stake. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (citing *Virginian Ry. Co. v. Sys. Fed'n*, 300 U.S. 515, 552 (1937)). Absent clear congressional intent to do so, a court will not presume that its equitable power has been limited.

> [T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Id.* Disgorgement of profits is, of course, a restitutionary and equitable remedy. *See, e.g., Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) ("[W]e have characterized damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits.'" (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987))). Respondents have not identified "a clear and valid legislative command," *Porter*, 328 U.S. at 398, curtailing this Court's inherent equitable powers. The Court thus retains the authority to order equitable relief such as disgorgement of profits.

---

[26] Although not at issue currently, nothing in the statutory language necessarily indicates that the Court could not order additional penalties or remedies not included in the Penalty Order.

### ii. The Disgorgement of Profits in the Penalty Order May Not Constitute a "Fine, Penalty, or Forfeiture"

Because assessing whether an order disgorging profits acts as a penalty is a highly fact-intensive inquiry, the Court cannot, at this early stage and on the record before it, determine whether the Commission's order of profit disgorgement constituted a penalty, bringing it within the plain language of § 2462. The Court must deny the Motion to Dismiss to the extent it seeks dismissal of the ordered disgorgement of profits as barred by the statute of limitations.

A "'penalty,' as the term is used in § 2462, is a form of punishment imposed by the government for unlawful or proscribed conduct, which *goes beyond remedying the damage caused* to the harmed parties by the defendant's action." *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996) (emphasis added). "When an individual is made to pay a noncompensatory sanction to the Government as a consequence of a legal violation, the payment operates as a penalty." *Kokesh v. SEC*, 137 S. Ct. 1635, 1644 (2017). "[A] pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner'—as opposed to compensating a victim for his loss." *Id.* at 1642 (quoting *Huntington v. Attrill*, 146 U.S. 657, 668 (1892)). An order for disgorgement of profits, however, ordinarily "is a remedy only for restitution—a more limited form of penalty than a civil fine. Restitution is limited to 'restoring the status quo and ordering the return of that which rightfully belongs to [another].'" *Tull*, 481 U.S. at 424 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946)).

Importantly, whether disgorgement constitutes a penalty is a "fact-intensive inquiry," because a "'penalty,' as the term is used in [§] 2462, is a form of punishment . . . which goes beyond remedying the damage caused to the harmed parties." *SEC v. Alexander*, 248 F.R.D. 108, 115 (E.D.N.Y. 2007); *see also FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d

1280, 1295 (N.D. Ga. 2018) (declining to determine at the motion to dismiss stage whether the ordered disgorgement fell within the ambit of § 2462 because "[d]etermining whether proposed remedies are penalties subject to [§] 2462 requires a 'fact-intensive inquiry'" (quoting *SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 884 (N.D. Tex. 2011))).

Respondents contend that the disgorgement of profits included in the Penalty Order, which holds Respondents jointly and severally liable (in different iterations) for each of the disgorgement payments, "is punitive in nature, and is subject to § 2462" as both a penalty and a forfeiture. (Mem. Supp. Mot. Dismiss 28–29.) FERC counters that "the ordered disgorgement is entirely restitutionary" because, "once paid, the disgorgement amount will be returned to the victims of Defendants' fraud." (Resp. Mot. Dismiss 25, ECF No. 99.)

Despite the joint and several liability the Penalty Order seeks to impose, the Court cannot determine on the current factual record whether the disgorgement the Commission ordered constitutes a "civil fine, penalty, or forfeiture" and thus falls within the scope of § 2462. The terms of the Penalty Order itself appear to indicate that the disgorgement was assessed for purely remedial—and not penal—purposes. The Penalty Order required Respondents to "distribute [their] unjust profits, plus interest, to PJM," which would thereafter "establish a method to resettle and distribute the resettled MLSA payments." (Penalty Order 88.) The Commission further directed PJM to identify "market participants that would have received higher MLSA payments in the absence of Respondents' activity," and "provide reimbursement of MLSA payments, and any available interest" to the market participants PJM identified who had been harmed. (*Id.*) This method for redistributing the MLSA payments to market participants who would otherwise have received the payments, and which the Commission had deemed Respondents wrongfully received, was directed at "restoring the status quo and ordering the

return of that which rightfully belongs" to the legitimate market participants. *Tull*, 481 U.S. at 424 (quoting *Porter*, 328 U.S. at 402).

However, the Commission also assessed disgorgement in way that made different groups of Respondents jointly and severally liable for the ordered disgorgement. As Respondents argue, this type of disgorgement *could* operate in a way that does not merely restore the status quo, but might place some of the Respondents in a position *worse* than the position they occupied before their alleged fraudulent trading. *See Tull*, 481 U.S. at 424. Of course, the Commission found the imposition of joint and several liability appropriate in a situation like the one before it in which "multiple entities . . . acted together to execute a fraudulent scheme," (Penalty Order ¶ 165), and "multiple respondents collaborate[d] or ha[d] a close relationship in executing the fraud," (*Id.* at ¶ 191).

Although the Commission reviewed a voluminous record and made extensive factual findings, it remains for this Court to conduct a review *de novo* of the law and the facts involved. *See* 16 U.S.C. §823b(d)(3)(B). Given the complicated nature of the energy trading scheme, the potentially convoluted relationship among all Respondents, and the fact-intensive nature of the Court's inquiry into whether disgorgement could constitute a penalty, the Court cannot determine at this stage whether the ordered disgorgement amounted to a penalty. While the Court finds this action within the statute of limitations, the Court will also deny the Motion to Dismiss to the extent it seeks to dismiss FERC's claims for disgorgement as barred by the statute of limitations because the factual record before the Court cannot conclusively establish whether the ordered disgorgement operated as a penalty bringing it within the plain language of § 2462.[27]

---

[27] Respondents also contend that the ordered disgorgement amounts to a forfeiture and thus "is subject to § 2462 because, by its plain terms, the limitations bar applies to actions for 'enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise.'" (Mem. Supp.

c.   **"When the Claim First Accrued"**

Because the relevant action for purposes of the statute of limitations question before the

Court is FERC's suit in this Court for an order affirming the Penalty Order, in order for FERC's

action to fall within the statute of limitations, it must have been "commenced within five years

from the date when the claim first accrued." 28 U.S.C. § 2462. Respondents assert that FERC's

claim accrued at the time of their alleged violations—between June 1, 2010, and August 3, 2010.

FERC argues that its claim first accrued when Respondents failed to pay the civil penalty within

---

Mot. Dismiss 29 (quoting 28 U.S.C. § 2462).) Respondents point to an opinion from the United
States Court of Appeals for the Eleventh Circuit stating that "for the purposes of § 2462[,]
forfeiture and disgorgement are effectively synonyms." (*Id.* (quoting *SEC v. Graham*, 823 F.3d
1357, 1363 (11th Cir. 2016)).) Based on this, Respondents argue that disgorgement of profits
falls within the language of § 2462 and is subject to the same time limitations as the civil fines.

But the historical interpretation of the catch-all limitations statute suggests otherwise.
The Supreme Court, interpreting the Revised Statute § 1047, 18 Stat. 193 (1874), which was
later codified at 28 U.S.C. § 791 (1911) and modified without any substantive change to become
§ 2462, *3M*, 17 F.3d at 1458 n.7, has noted that

> [t]he words "penalty or forfeiture" . . . refer to *something imposed in a punitive
> way* for an infraction of a public law, and do not include a liability imposed solely
> for the purpose of redressing a private injury, even though the wrongful act be a
> public offense, and punishable as such.

*Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915) (emphasis added). Here, the
Commission ordered disgorgement of profits to redress the MLSA payments it found that
Respondents had wrongfully received in the place of other market participants, not as a punitive
sanction for Respondents' conduct. Respondents' suggested interpretation of "forfeiture" in this
context cannot stand.

The Court need not disagree with the Eleventh Circuit to reach this conclusion. The
Fourth Circuit has acknowledged that, at least when the Securities and Exchange Commission
(the "SEC") orders disgorgement of profits, it *can* serve a punitive function. "The purpose of
disgorgement is not to compensate investors, but to force the defendant into giving up unjust
enrichment he received as a result of his illegal activities." *SEC v. Gotchey*, 981 F.2d 1251, at *2
(4th Cir. 1992) (Table Opinion) (citing *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), *cert.
denied*, 486 U.S. 1014, 1015 (1988)). Thus, an SEC order for disgorgement of profits *could*
amount to "something imposed in a punitive way." *Meeker*, 236 U.S. at 423.

Regardless, the fact-intensive inquiry necessary to determine whether the ordered
disgorgement constitutes a penalty subject to § 2462 is not amenable to a determination at this
early stage.

sixty days of the Commission issuing the assessment order under 16 U.S.C. § 823b(d)(3)(B)—on July 28, 2015.[28] Based on the plain meaning of the word "accrue," the Court finds that FERC's suit for an order affirming the Penalty Order accrued when Respondents failed to pay the assessed penalty within sixty days of its issuance.

### i.  The Language of § 2462

Although § 2462 does not lend itself readily to application to the Alternate Option of § 823b, the Court must interpret the statutory language in light of the principle that "Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning." *Pioneer Inv. Servs. Co.*, 507 U.S. at 388 (quoting *Perrin*, 444 U.S. at 42). Courts "must give effect to the text Congress enacted," and may not rewrite statutes to create results they deem more desirable. *Ali*, 552 U.S. at 228. And, of course, "[s]tatutes should be interpreted to avoid . . . unreasonable results whenever possible." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982).

"In common parlance a right accrues when it comes into existence." *Gabelli*, 568 U.S. at 448 (quoting *United States v. Lindsay*, 346 U.S. 568, 569 (1954) (alteration omitted)). "A claim normally accrues when the factual and legal prerequisites for filing suit are in place." *3M*, 17 F.3d at 1460 (citing *Lindsay*, 346 U.S. at 569). It therefore follows that "the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" *Gabelli*, 568 U.S. at 448 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Such a definition of

---

[28] FERC suggests alternatively that two "mandatory waiting periods" exist in the statute, and the Court should toll any statute of limitations for those two lengths of time, if the Court finds that the statute of limitations begins to run from the date of the violation. According to FERC, this tolling would render its action timely as to the entire Two-Month Alleged Manipulation Period. Because the Court concludes that the claim accrued sixty days after Respondents failed to pay the Penalty Assessment Order, the Court does not address this argument.

"accrue" has "appear[ed] in dictionaries from the 19th century up until today." *Id.* (citing 1A Burrill, *A Law Dictionary and Glossary* 17 (1850), which stated that "an action *accrues* when the plaintiff has a right to commence it.").

At times, however, the ordinary, common, and natural reading of statutory language does not easily translate to the situation before a court. As at least one court addressing claim accrual in the context of agency action has noted that, although the concept of accrual "appears to be a straightforward formulation, there may be complications: 'The statutory period may begin either when the defendant commits his [or her] wrong or when substantial harm matures. This choice, unnecessary where the two events are simultaneous, becomes complex where considerable time intervenes . . . .'" *3M*, 17 F.3d at 1460 (quoting Note, *Developments in the Law Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1200 (1950)).

The Court faces that complex choice. Given the structure of § 823b, the largely one-sided nature of investigations the Commission undertakes, and the unusual procedural pathway an action under the Alternate Option follows, a substantial length of time could separate the point at which "a defendant's [prohibited] conduct occurs," *Gabelli*, 568 U.S. at 448, and the date on which FERC "institute[s] an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty," 16 U.S.C. § 823b(d)(3)(B). Here, in fact, more than five years passed between the start of the Two-Month Alleged Manipulation Period and FERC's action in this Court, which gives Respondents their *first* opportunity for an adversarial adjudication of their allegedly manipulative activities.

### ii.    The Two Procedural Pathways in § 823b for Assessing a Civil Penalty

In interpreting how § 2462 applies to the action at bar, the Court remains mindful of "the hazards inherent in attempting to define *for all purposes* when a 'cause of action' first 'accrues.'"

*Crown Coat*, 386 U.S. at 517 (emphasis added). Statutes of limitations "are to be 'interpreted in the light of the general purposes of the statute and of its other provisions, and with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought.'" *Id.* (quoting *Koons*, 271 U.S. at 62). The Court must determine how § 2462 applies in the particular context of § 823b, and specifically, in the context of the Alternate Option. Given the singular procedural path of this case, the Court recaps the aspects of 16 U.S.C. § 823b(d) most relevant to its ruling on the Motion to Dismiss.

Turning to the statute at issue, Section 823b(d) sets forth two paths[29] for the assessment and adjudication of a civil penalty for violations of the Federal Power Act. Before the person or entity subject to civil penalties chooses a path, the statute requires that "the Commission . . . provide to such person notice of the proposed penalty." 16 U.S.C. § 823b(d)(1). Here, the Commission issued the notice—the OSC—on December 17, 2014, more than four years after the end of the Two-Month Alleged Manipulation Period. Under the statute, the person or entity has thirty days after receiving notice to inform the Commission which procedural track he or she elects to follow. *Id.* That choice determines which route is taken for the civil penalty adjudication.

As determined in *FERC I*, the Default and the Alternate Options both envision, at some point, an adversarial proceeding encompassing procedural protections. Under the Default Option, the propriety and amount of the civil penalty is adjudicated before an Administrative Law Judge in accordance with the Administrative Procedures Act. Under the Alternate Option, the adjudication occurs before a federal district judge in accordance with the Federal Rules of

---

[29] As earlier noted, the atypicality of the Alternate Option has confounded a series of courts as to the proper route for judicial review under the Alternate Option. It would seem advisable for Congress or FERC to clarify the expected procedure, including addressing whether an internal statute of limitations would provide guidance to affected parties.

Civil Procedure and the Federal Rules of Evidence. On January 12, 2015, Respondents elected the Alternate Option, meaning that Respondents elected to have the propriety and amount of the penalty adjudicated before a federal district court.

The structure of the statute itself demonstrates the intent that adversarial adjudication of the penalty occur *either* in the administrative context—under the Default Option—*or* in the judicial context—under the Alternate Option. First, Section 823b(d)(4) allows the Commission to "compromise, modify, or remit, with or without conditions," any civil penalty imposed "at any time prior to a final decision by the court of appeals under [the Default Option] or by the district court under [the Alternate Option]." 16 U.S.C. § 823b(d)(4). By allowing the Commission to modify the penalty it imposed at any time before either a final decision under the administrative Default Option or a judicial decision under the Alternate Option, the statute itself describes district court adjudication as an alternate track for reaching the same result as the administrative option: a final adjudication on the merits.

A second provision of § 823b even more clearly illustrates a statutory scheme allowing for two alternate paths for civil penalty adjudication. Section 823b(d)(5) provides that, if a party fails to pay a penalty assessment "after it has become a final and unappealable order under [the Default Option], or after the appropriate district court has entered final judgment in favor of the Commission under [the Alternate Option], the Commission shall institute an action" in a district court to recover the penalty amount. 16 U.S.C. § 823b(d)(5). In this enforcement action,[30] "the

---

[30] This statutory subsection parallels the subsections under which many of the courts addressing the applicability of § 2462 to administrative actions and deciding when a claim for the enforcement of a civil penalty "accrues" under § 2462 operated—another aspect of § 823b that complicates this Court's analysis of the statute of limitations issue.

validity and appropriateness of [the] final assessment order or judgment *shall not be subject to review*." *Id.* (emphasis added).

Finally, two similarities between the Default Option and Alternate Option also indicate an intention of different paths meant to arrive at the same destination. First, both are commenced by issuance of the notice of proposed penalty under 16 U.S.C. § 823b(d)(1).[31] After this notice issues, thirty days elapse before the alleged violator either elects to have the Alternate Option process apply, or fails to do so, in which case the Default Option governs. Second, both the Default and Alternate Option contemplate an ultimate adversarial adjudication. Under the Default Option, which is governed by the APA, the adversarial adjudication occurs before an ALJ: when an individual fails to elect the Alternate Option, a penalty is assessed, "by order, *after a determination of violation has been made on the record* after an opportunity" for a formal administrative hearing. 16 U.S.C. § 823b(d)(2)(A) (emphasis added). Under the Alternate Option, the adversarial adjudication occurs before a district court after the Commission "promptly assess[es]" the penalty by order. 16 U.S.C. § 823b(d)(3)(A)–(B). The Alternate Option contains no requirement that the Commission determine a violation has occurred before assessing the penalty, but provides for a "review de novo of the law and the facts involved" in the district court. 16 U.S.C. § 823b(d)(3)(B).

Thus, several aspects of § 823b indicate a statutory intent that the initial adversarial penalty adjudication occur either before an ALJ or before a district court: (1) the path to adjudication in either forum begins with the notice required by § 823b(d)(1); (2) the Commission may modify its penalty assessment at any time before the adjudication in either forum completes;

---

[31] Here, the Commission satisfied this statutory notice requirement when it issued the Order to Show Cause. *See* 18 C.F.R. § 385.1506(b).

and, (3) the Commission institutes an enforcement action for a penalty left unpaid after the completion of adjudication in either forum.

However, under the Alternate Option, the statute provides no method by which FERC could bring an action in district court before alleged violators fail to pay the assessed penalty under the Alternate Option. Thus, although the structure of § 823b indicates an intent that the adversarial *administrative* proceeding under the Default Option and the adversarial *judicial* proceeding under the Alternate Option pave different avenues to equivalent destinations, the statute dictates that those avenues begin at different times, and FERC exercises differing amounts of control over the time at which each avenue commences.

An administrative adjudication under the Default Option, like traditional administrative ALJ proceedings, begins when FERC issues the OSC, which provides the requisite notice under § 823b(d)(1)—which FERC, under the statute, can do at any time.

In contrast, a judicial adjudication begins only after: (1) FERC issues an OSC; (2) the alleged violator has chosen the Alternate Option; (3) a penalty has been assessed by order; (4) sixty days have elapsed without the violator paying the assessed penalty; and, (5) FERC has instituted a suit in a district court for an order enforcing the civil penalty. FERC exercises only *some* control over the timing of the process leading to adversarial adjudication under the Alternate Option.

Because FERC had no statutory authority to initiate this action until the first four of these events occurred, only then were "the factual and legal prerequisites for filing suit . . . in place," *3M*, 17 F.3d at 1460 (citing *Lindsay*, 346 U.S. at 569). This became the point at which FERC's claim for "an order affirming the assessment of the civil penalty" under 16 U.S.C. § 823b(d)(3)(B) accrued.

33

### iii.    **Relevant Caselaw**

Each of the parties argues that caselaw strongly supports its position.  And although the

parties acknowledge that neither the Fourth Circuit nor the Supreme Court has directly addressed

this issue—and therefore no decision *binds* this Court—the parties each fail to place the square

pegs of the cases they rely on into the round holes of the administrative scheme at bar, or to even

acknowledge that no perfect "fit" exists.  The cases that the parties have cited and the Court has

identified fall into three general categories, none of which parallels the situation before this

Court.

First, the parties identify cases addressing enforcement actions after traditional

administrative adjudications, similar to those that occur under the Default Option.  *See United*

*States v. Meyer*, 808 F.2d 912 (1st Cir. 1987).  The *Meyer* line of cases, however, cannot govern

this action because of the important procedural differences between the Alternate Option and a

traditional administrative action, specifically the potential for delay inherent in what some courts

refer to as a byzantine administrative process.

The parties also point to cases involving enforcement actions against the United States

after mandatory administrative proceedings.  *See Crown Coat Front Co. v. United States*, 386

U.S. 503 (1967).  The *Crown Coat* cases also cannot control here, because those cases involve

administrative proceedings over which the plaintiff had no control, and *Crown Coat* and cases

like it expressed concern over the possibility that a plaintiff could—through no fault of his or her

own—face situations in which the mandated pre-filing administrative proceedings consumed the

entire statute of limitations.

Finally, the parties refer to cases addressing enforcement actions by the United States

under statutes requiring *no* prior administrative process.  *See Unexcelled Chem. Corp. v. United*

34

*States*, 345 U.S. 59 (1953). The *Unexcelled* cases, however, cannot dictate because the Alternate

Option requires FERC to comply with *some* administrative procedures before initiating this

action. Accordingly, as noted, the Court finds no individual case or line of cases directly inform

this decision.

<strong>a.     Enforcement Actions after a Traditional<br>Administrative Adjudication</strong>

One group of cases interpreting the meaning of § 2462 are those in which a government

agency sues in district court for the enforcement of a civil penalty that was imposed through an

adversarial administrative adjudication—a process similar to the Default Option. The *Meyer* line

of cases presents the enticingly simple rule that, when a statute mandates administrative

proceedings before a court action may commence, § 2462 provides one five-year time limit

within which the *administrative* proceedings must commence, and another, separate five-year

time limit after the conclusion of the administrative proceedings within which *judicial*

proceedings must begin. This reasoning, although attractive in its simplicity, cannot govern here.

The administrative processes in cases following *Meyer* contain important procedural safeguards

absent from those in the Alternate Option, meaning that the concerns for abuse and delay that

drove much of the *Meyer* court's decision do not present themselves in the Alternate Option.

Under the Alternate Option, the investigation and assessment period is subject to few statutory or

regulatory requirements and is almost exclusively within the Commission's control.

In the end, the parties overstate the holdings of this line of cases. *Meyer* and cases

following it have stated generally that when a statute that "authorizes the assessment of a penalty

provides for an administrative procedure for assessing that penalty, the statute of limitations at

§ 2462 does not begin to run until 'the penalty has first been assessed administratively.'" *United

States v. Godbout-Bandal*, 232 F.3d 637, 639 (8th Cir. 2000) (quoting *Meyer*, 808 F.2d at 914).

However, these cases involved the enforcement of civil fines, assessed via a final agency action whose procedural protection more closely mirrored the Default Option than the Alternate Option. And the reasoning of *Meyer* relied in part on that court's significant concern with the potential for abuse inherent in the mandatory administrative procedures involved in that case.

*Meyer* involved a suit under the Export Administration Act ("EAA"), 50 U.S.C. § 4601, *et seq.*[32] In *Meyer*, the Department of Commerce (the "DOC") initiated "enforcement proceedings against Meyer by issuing a 'charging letter'[33] pursuant to 15 C.F.R. § 388.4(a)." *Meyer*, 808 F.2d at 913. The letter also informed Meyer that because no administrative sanction under the EAA "may be imposed [until after the person received] . . . notice and [the] opportunity for an agency hearing on the record in accordance with [the APA]," 50 U.S.C. § 4610(c)(2)(B), Meyer was entitled to a hearing if he demanded one in writing. 15 C.F.R. § 388.4(a) (1986). It also warned that failure to answer the letter "may be treated as a default," and that he could be represented by counsel. *Id.*

Meyer elected a hearing, and, "after two years of skirmishing, the administrative law judge . . . assigned to the matter rendered an initial decision[, the ALJ found] . . . Meyer to have transgressed the EAA" and assessed a $5,000 civil penalty. *Meyer*, 808 F.2d at 913. "Meyer's further intra-agency protests were bootless[, and more than one year later,] the [DOC] affirmed the decision of the ALJ in all respects." *Id.* After Meyer failed to pay the assessed civil penalty,

---

[32] At the time period relevant to the *Meyer* court's determination, the EAA was codified at 50 U.S.C. § 2401, *et seq. Meyer*, 808 F.2d at 913.

[33] Under the governing regulation, the charging letter included a statement that "there [wa]s reason to believe" a violation occurred; set forth "the essential facts" about the violation; referred to the specific regulatory provisions involved; and gave Meyer notice that he would be subject to sanctions. 15 C.F.R. § 388.4(a) (1986). In many ways, therefore, the "charging letter" in the administrative proceedings that *Meyer* reviewed was similar to the OSC the Commission issued Respondents. *See* 18 C.F.R. 385.1506(b).

the DOC brought an enforcement suit in district court pursuant to 50 U.S.C. § 4610(f),[34] *id.*, which allows an agency to bring "a civil action for the recovery thereof" in the name of the United States when a person fails to pay an imposed penalty.[35] 50 U.S.C. § 4610(f). In that action, "no such liability shall be asserted, claimed, or recovered upon by the United States in any way *unless it has previously been reduced to judgment.*" *Id.* (emphasis added).

Not only did the *Meyer* court apply § 2462 to an administrative decision in a different procedural context than the one before this Court, but *Meyer's* reasoning also partially relied on the specific procedural mechanism through which the enforcement action came before it. The *Meyer* court expressed concern with "the manifold opportunities for . . . delay which inhere both as a matter of trial tactics and in the innards of the administrative process." *Meyer*, 808 F.2d at 920.[36]

---

[34] The *Meyer* decision cited to 50 U.S.C. § 2410(f), because that provision governed at the time of the alleged violation in *Meyer*. *Meyer*, 808 F.2d at 915. Section 2410 was transferred to 50 U.S.C. § 4610 in 1979, *see* Export Administration Act of 1979, Pub. L. No. 96-72, 93 Stat. 503 (1979), so the Court cites to the transferred § 4610.

[35] This section of the EAA, under which the United States sued in *Meyer* has similarities to the § 823b(d)(5), which directs the Commission to institute an action for a civil penalty recovery if a party fails to pay a penalty assessment "after it has become a final and unappealable order under [the Default Option], or after the appropriate district court has entered final judgment in favor of the Commission under [the Alternate Option]." 16 U.S.C. § 823b(d)(5).

[36] The *Meyer* court's holding, although not expressly limited to the procedural framework before it, relied heavily on that context.

> In a situation like that at bar, when the [DOC] issues a charging letter, the imperatives of the Administrative Procedure Act (APA) come into play. From that point on, *the timing of the case is largely beyond the Department's control.* Additionally, regulations which implement the APA's adjudicatory rules, designed to ensure procedural fairness, afford the private litigant a wide range of protections during the administrative processing of his case. . . . At the time of this case's administrative development, there were no temporal constraints governing the duration of these pre-hearing proceedings; no limits existed as to the time administrative adjudication might take, or as to when an ALJ had to render his decision. Moreover, even after the ALJ has issued an initial decision,

Few of the administrative occurrences with which the *Meyer* court expressed concern exist in this case. Under the Alternate Option, the "imperatives of the . . . APA . . . " never apply. *Id.* at 919. Unlike the situation in *Meyer*, the timing of the case under the Alternate Option remains almost exclusively in the Commission's control, and few regulations exist depriving the Commission of control over the timing of proceedings under the Alternate Option. Finally, under the Alternate Option, the alleged violator has no right of appeal. Thus, although the procedures under the Alternate Option did, in the instant case, take time, the amount of time largely remained within the Commission's control.

Other cases either follow or parallel *Meyer*, and similarly involve enforcement actions initiated after a typical agency adjudication similar to proceedings under the Default Option. *See Godbout-Bandal*, 232 F.3d at 640 ("[W]here an Act [like the Change in Bank Control Act,] which authorizes the assessment of a civil penalty also provides for an administrative procedure for assessing that penalty, the statute of limitations period set out in § 2462 will not begin to run until that administrative process has resulted in a final determination." (footnote omitted)); *United States Dep't of Labor v. Old Ben Coal Co.*, 676 F.2d 259, 261 (7th Cir. 1982) ("In the context of the Coal Act, the district court claim accrues only after the administrative proceeding has ended, a penalty has been assessed, and the violator has failed to pay the penalty.").[37]

---

the [DOC] cannot necessarily sue to enforce the resultant penalty; the respondent enjoys a right of appeal to the Assistant Secretary of Commerce for Trade Administration. These kinds of procedures necessarily take time; indeed, in the instant case, administrative activity consumed over three years.

*Id.* at 919–20 (emphasis added) (footnotes omitted) (citations omitted).

[37] At least five district courts across the country have, in six decisions, likewise relied on *Meyer* in actions procedurally similar to the one before the *Meyer* court—actions coming to those courts after adversarial administrative procedures similar to the *Default* Option of § 823b, meaning they are unlike the Alternate Option this Court faces. The Court in *United States v. Worldwide Indus. Enters., Inc.* found that "under the plain meaning of [§] 2462, the limitations

Because the action before the Court contains crucial procedural differences from the process the *Meyer* court evaluated and that raised many of the concerns driving the *Meyer* court's decision, the reasoning of *Meyer* or other cases like it cannot control.

### b. Enforcement Actions *Against* the United States after Requisite Administrative Proceedings

A second line of cases on which the parties rely also involves circumstances sufficiently different from those the Court faces here that the reasoning of those cases fails to govern. The *Crown Coat* line of cases involves enforcement actions *against* the United States after mandatory pre-filing administrative proceedings over which the plaintiff exercised no control. Courts following the reasoning of *Crown Coat* express concern with the requisite administrative proceedings that can consume the entire statute-of-limitations period, and reason that, because the plaintiffs in those cases have no control over the speed of the administrative proceedings,

---

period for [§] 503(b)(4) of the Communications Act beg[an] at the time the forfeiture order [was] issued, not when the underlying violation occur[red]." 220 F. Supp. 3d 335, 346 (E.D.N.Y. 2016). Similarly, the United States District Court for the Western District of Washington dismissed the United States' suit as barred by § 2462 because the United States sued to enforce its penalty in 2010, although its claim "accrued 30 days after it issued its May 2002 penalty notice . . . [when] nothing prevented the Government from timely filing a suit to collect its penalty." *United States v. Sacks*, No. C10-534RAJ, 2011 WL 6883740, at *4 (W.D. Wash. Dec. 28, 2011). In *United States v. Great Am. Veal, Inc.*, the court held that the statute of limitations began to run after the administrative assessment occurred because "the Packers Act required the government to first obtain a civil penalty assessment through an administrative proceeding prior to instituting an enforcement proceeding in this court." 998 F. Supp. 416, 423 (D.N.J. 1998). The District Court for the Southern District of Iowa in *United States v. McIntyre* found that "[because t]he government could not bring an action in this court to enforce the penalty until the final decision was issued, . . . . plaintiff's claim did not accrue for purposes of § 2462 until the assessment became final and unappealable." 779 F. Supp. 119, 122 (S.D. Iowa 1991). The *United States v. McCune* court followed *Meyer* and noted that "[t]he statute expressly states that the five year statute of limitations beg[an] to run 'from the date when the claim first accrued[.]' A claim to collect an administratively imposed civil penalty cannot accrue until the penalty is administratively imposed." 763 F. Supp. 916, 918 (S.D. Ohio 1989). Finally, in *United States v. N.O.C., Inc.* the United States District Court for the District of New Jersey held that the Toxic Substances Control Act ("TOSCA") created "two distinct causes of action," each "triggered by separate events, and each merit[ed] a separate application of [§] 2462's time bar." No. 87-3539, 1988 WL 109727, at *7 (D.N.J. Oct. 14, 1988).

inequity would follow if the statute of limitations commenced at the time of the underlying violation. *Crown Coat* cannot control here. Although the administrative proceedings of the Alternate Option, like those with which the *Crown Coat* court was concerned, would have taken close to all of a five-year statute of limitations period, unlike plaintiffs in cases similar to *Crown Coat*, the plaintiff in this action (FERC) exercised substantial—indeed, nearly *exclusive*—control over the nature and speed of the administrative proceedings.

In *Crown Coat*, a private contractor sued the United States under the Tucker Act for the adjustment of a government contract which expressly conditioned the contractor's right to sue on administrative exhaustion. *Crown Coat*, 386 U.S. at 505. The statute of limitations, 28 U.S.C. § 2401(a) provided that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a); *Crown Coat*, 386 U.S. at 507. The plaintiff in *Crown Coat* brought suit more than six years after the events underlying its contract claim, but fewer than six years after the final administrative decision. *Crown Coat*, 386 U.S. at 508. The district court dismissed the contractor's claim as time-barred, concluding that it accrued at the time of the contract dispute, and the United States Court of Appeals for the Second Circuit affirmed. *Id.* at 509. The Supreme Court reversed, holding that the plaintiff's claim under the contract accrued "upon the completion of the administrative proceedings contemplated and required by the provisions of the contract." *Id.* at 510–11. Reasoning that "the 'right of action' of which [the relevant statute of limitations] speaks is not the right to administrative action but the right to file a civil action in the

40

courts of the United States," the Supreme Court stated that the plaintiff acquired "the right to resort to the courts only upon the making of th[e] administrative determination."[38] *Id.* at 511–12.

Like *Meyer*, *Crown Coat* does not dictate this Court's determination of the statute of limitations issue before it. Although *Crown Coat* found that the right of action there, like here, meant the right to file a civil action in the United States Courts, it did so addressing a statutory scheme meaningfully different from § 823b. *Crown Coat*, like *Meyer*, evaluated a statutory scheme in which the party against whom the statute of limitations might run (the contractor plaintiff in *Crown Coat* and the government defendant in *Meyer*) was required to comply with and wait for the termination of administrative proceedings *over which the party had no control*.

In contrast, the Commission almost exclusively controls the amount of time the administrative proceedings take under the Alternate Option. And although, as evinced by the instant case, proceedings before choosing the Alternate Option *can* take all—or close to all—of the five-year statute of limitations period, unlike in *Crown Coat*, the amount of time consumed

---

[38] The Supreme Court in *Crown Coat*, like the *Meyer* court, relied on the specific procedural processes with which the plaintiff had to comply.

> To hold that the [statute of limitations] runs from the completion of the contract . . . would have [an] unfortunate impact. The contractor is compelled to resort to administrative proceedings *which may be protracted* and which may last not only beyond the completion of the contract but continue for more than [the statute of limitations period]. If the time bar starts running from the [contract] completion date, *the contractor could thus be barred from the courts by the time his administrative appeal is finally decided*. This would be true whether he wins or loses before the board of appeals. Even if he prevailed there and was granted the equitable adjustment he sought, the Government would be immune from suit to enforce the award if more than six years had passed since the completion of the contract. This is not an appealing result, nor in our view, one that Congress intended. The [statutory scheme] evidences a congressional purpose to insure adequate judicial review of administrative decisions on claims arising under government contracts; it is very doubtful that it anticipated no review at all if administrative proceedings, *compulsory on the contractor*, continued for more than six years beyond the contract's completion date.

*Id.* at 514 (emphasis added).

by administrative activity was largely (if not entirely) within the Commission's control. Cases like *Crown Coat*, which involve suits brought by individuals subject to requisite administrative proceedings out of their control, provide this Court with little guidance. *Cf. McMahon v. United States*, 342 U.S. 25, 27 (1951) (statute of limitations begins to run from the date of the injury when the plaintiff could have brought suit at any time)

The action before the Court contains fundamental procedural differences from those driving the *Crown Coat* decision. Although the underlying administrative activities were lengthy, FERC exercised near-exclusive control over the timing of that process. Unlike in *Crown Coat*, FERC *could* control whether the entire statute-of-limitations period could run before FERC was able to issue a final Penalty Order. The Court cannot find that the reasoning of *Crown Coat* controls.

        c.      **Enforcement Actions by the United States When No Prior Administrative Process Was Required**

The final group of cases interpreting § 2462 to which the parties direct the Court also involves statutory conditions so different from § 823b that these cases cannot direct this Court's analysis. The *Unexcelled* line of cases addresses circumstances in which statutes *allowed* but did not *require* administrative procedures as a necessary prerequisite to bringing a case in district court. Courts following the *Unexcelled* line of reasoning rely on the non-mandatory nature of the earlier administrative action to conclude that those claims accrued at the time of the alleged violation. *Unexcelled* cannot control here, though, because FERC had no authority to bring suit in this court until a specified period of time after Respondents failed to pay the assessed Penalty Order. For FERC, administrative proceedings *did* constitute a necessary prerequisite to bringing this case in this Court.

In *Unexcelled*, the Supreme Court interpreted the applicability of a statute of limitations to a suit by the United States for violations of the Walsh-Healey Act, 41 U.S.C. § 6501, *et seq*. The United States contended that Unexcelled knowingly used child labor between 1942 and 1945, and in 1947, the Secretary of Labor issued an administrative complaint against Unexcelled. *Unexcelled*, 345 U.S. at 60. After some sort of administrative process, a "Hearing Examiner" found that Unexcelled had violated the Walsh-Healey Act, "and was indebted to the United States in the sum of $15,600." *Id.* The determination became final when Unexcelled did not appeal. *Id.* Almost one year later, in 1950, the United States sued for collection of the penalty. *Id.* Unexcelled asserted the governing two-year statute of limitations, 29 U.S.C. § 255,[39] as a defense, and the United States argued in response that the statute of limitations begins to run "only after it is administratively determined by the Department of Labor that the contractor is liable to the United States. . . ." *Id.* at 61–65.

The Supreme Court sided with Unexcelled, holding that "'the cause of action accrued' within the meaning of [29 U.S.C. § 255] . . . when the minors were employed." *Id.* at 65. Acknowledging that broad aspects of the "administration of the [Walsh-Healey] Act is entrusted" to the administrative process, the Supreme Court reasoned that, given the structure of the Walsh-Healey Act, these administrative powers, "important as they are in determining the relation between the courts and the administrative branch of government . . . are irrelevant to the narrow

---

[39] In relevant part, § 255

> provides a two-year statute of limitations for any action commenced on or after the date of the Act "to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act[;]" [§ 255] also provides that "every such action shall be forever barred unless commenced within two years after the cause of action accrued[.]"

*Unexcelled*, 345 U.S. at 61 (quoting 29 U.S.C. § 255).

question of law" before the Court. *Id.* (internal citations omitted). The *Unexcelled* Court relied on the statutory provisions and the power it granted the United States.

> [T]he Walsh-Healey Act provides that *the Attorney General may bring suit to recover moneys owed* the United States. The fact that due deference to the administrative process should make a court hold its hand until the administrative proceedings before the Secretary of Labor have been completed, is a matter of judicial administration and of no relevancy here. *The statutory liability accrued when the minors were employed.* It was from that date that the period of limitations began to run.

*Id.* at 65–66 (emphasis added) (footnotes omitted) (citations omitted).[40]

Unlike the United States in *Unexcelled*, FERC was statutorily mandated to provide some sort of administrative process to Respondents—either through the Default Option or the Alternate Option. No other right to sue, by the Attorney General or any other entity, exists in § 823b. FERC, unlike the United States in *Unexcelled*, could *not* "have brought suit without first resorting to administrative remedies." *Crown Coat*, 386 U.S. at 519 (describing the process at issue in *Unexcelled*). Because the Alternate Option proceedings lack the important statutory attributes that guided the Supreme Court's analysis *Unexcelled* (and similar cases involving statutes that did not condition the right to sue on administrative action) fail to provide this Court with meaningful guidance. *See United States v Lovknit Mfg. Co.*, 189 F.2d 454, 458 (5th Cir. 1951) (holding that, under the Walsh-Healey Act, an action accrues at the time of the alleged wrong, and noting that "the Act in plain language give[s] the Attorney General alone the authority to sue upon a breach . . . . [Administrative] machinery is not a prerequisite to the

---

[40] Indeed, the statutory scheme under which Unexcelled had accrued liability to the United States provided that "the party responsible for a breach or violation . . . *is liable* to the Federal Government for . . . liquidated damages." 41 U.S.C. § 6503(b). Any amount "due the Federal Government because of a breach or violation . . . may be recovered in a suit brought by the Attorney General." 41 U.S.C. § 6503(d). And, although "[t]he Secretary . . . *may* hold hearings when there is a complaint of breach or violation," 41 U.S.C. § 6507(b) (emphasis added), nothing in the statute *mandated* administrative proceedings before the United States could sue to recover the amount due.

44

Attorney General's suit, bu[t] may be a help in trying it, and a saving of court time"); *Lance, Inc. v. United States,* 190 F.2d 204, 204 (4th Cir. 1951) (adopting *Lovknit*).

## C.     FERC Timely Commenced the Instant Action

Although the parties' positions each have strengths, the Court cannot find that this district court action accrued at the time of Respondents' alleged violations even given the extended timeframe of non-adversarial agency actions that preceded the filing of a Complaint here. The Court must so conclude because the reading Respondents advocate conflicts with the generally accepted plain meaning of "accrue." Based on the plain meaning of the word "accrue," under which accrual occurs "when the factual and legal prerequisites for filing suit are in place," *3M,* 17 F.3d at 1460 (citing *Lindsay,* 346 U.S. at 569), the Court finds that FERC's suit for "an order affirming the assessment of the civil penalty"—the action currently pending before this Court— accrued when Respondents failed to pay the Commission's penalty assessment order within sixty days of its issuance.

The Court acknowledges that aspects of Respondents' arguments seem more consistent with the overall statutory scheme of § 823b and the purposes of statutes of limitations. But the Court is "not at liberty to rewrite [a] statute to reflect a meaning [it] deem[s] more desirable. Instead, [courts] must give effect to the text Congress enacted." *Ali,* 552 U.S. at 228. The Court will—as it must—give the words of § 2462 their plain, ordinary, and contemporary meaning. Under that reading, the instant cause of action accrued when Respondents failed to pay the Commission's penalty assessment order within sixty days of its issuance. FERC timely filed this action.

### III.  Conclusion

For the foregoing reasons, the Court will deny Respondents' Motion to Dismiss.  An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 9/24/2018
Richmond, Virginia